UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

HOWARD HINKLE, JR.,

        Defendant.

23-CR-99-LJV-JJM
DECISION & ORDER

---

The government moves to revoke an order of United States Magistrate Judge Jeremiah J. McCarthy granting a renewed motion for release filed by the defendant, Howard Hinkle, Jr. *See* Docket Item 217 (appealing Docket Item 209). After careful review of the parties' briefing, *see* Docket Items 217, 235, 274, and 299, and oral argument, *see* Docket Item 257, this Court grants the government's motion and revokes Judge McCarthy's release order for the reasons that follow.

## **BACKGROUND**[1]

On November 3, 2023, United States District Judge John L. Sinatra, Jr., ordered that Hinkle be detained.[2] Docket Item 12. Judge Sinatra based that decision on, among other things:

---

[1] This Court assumes the reader's familiarity with the factual background of this case and recounts only the facts necessary to explain its decision.

[2] Hinkle initially was ordered released on conditions by United States Magistrate Michael J. Roemer, *see* Docket Item 6; however, Judge Sinatra granted the government's motion to revoke that order, *see* Docket Item 12.

- "the quantities of [marijuana] plants and firearms" found at Hinkle's residence;

- "the SWAT team's effort to clear the residence; the difficult circumstances to clear the house"; Hinkle's "conduct when the agents were clearing his house"; "and the danger that [Hinkle's] actions in sequence created";

- "the placement of [Hinkle's] weapons";

- "the proffers regarding the marijuana, the text messages, the sales, et cetera, and the firearms in conjunction with the marijuana sales and in conjunction with the growing of marijuana and in conjunction with the felony";

- Hinkle's "questionable employment situation . . . in terms of where is the money coming from to support himself month to month";

- Hinkle's "criminal history";

- Hinkle's "mental health and his substance abuse";

- Hinkle's "December . . . 2021 threat to kill his wife and himself"; and

- "the grow operation" and "the firearms."

Docket Item 217-2 at 59-60.  Judge Sinatra also considered "for what it is worth" the government proffer "regarding the death of Crystal Quinn and the statement about her having a bounty on her life."  *Id.* at 60.  Judge Sinatra noted that the statement about the bounty was "corroborated by someone other than [Simon] Gogolack."  *Id.*

Based on all that, Judge Sinatra found "by clear and convincing evidence that . . . Hinkle's release would pose a danger to the safety of others in the community, and that

no condition or combination of conditions will assure the safety of others or the community if [he] were released pending trial." *Id.* at 60-61. And "[b]ecause [he] found that the [g]overnment [had] established . . . Hinkle's danger to the community by clear and convincing evidence, [Judge Sinatra did] not [need to] decide whether [Hinkle's] release would pose a risk of flight." *Id.* at 61.

On August 1, 2024, Hinkle moved for release from custody. Docket Item 174. He argued (1) that Judge McCarthy's July 29 sanctions order "constitute[d] a substantial change in circumstances that would warrant his immediate release from custody" and (2) that his common law wife, Dillon Anderson, was "willing to put up the family home to guarantee . . . Hinkle's presence in court." Docket Item 174-1 at ¶¶ 5-6.

Judge McCarthy ordered Hinkle released on conditions, including home incarceration, Anderson's posting the equity in the family home, and Hinkle's son executing a $50,000 signature bond. *See* Docket Item 252 at 13-15. Judge McCarthy found that "the two forms of security that [he had] requested [we]re sufficient to reasonably assure [him] that, if released, [Hinkle would] not pose a risk of flight or danger to the community." *Id.* at 19. Judge McCarthy added that Hinkle "knows what it's like to be in custody" and that Judge McCarthy was "sure [Hinkle did not] want to go back there." *Id.*

This Court reviews Judge McCarthy's release order de novo. *See United States v. Leon*, 766 F.2d 77, 80 (2d. Cir. 1985). Thus, the narrow question before this Court is

3

whether there is any new information that would change Judge Sinatra's decision.[3] For the reasons that follow, this Court finds that there is not.

## DISCUSSION

The four factors that the Court must consider when deciding whether a defendant should be released pending trial under the Bail Reform Act are:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a [f]ederal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under [f]ederal, [s]tate, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). In addition to the arguments he made before Judge McCarthy, Hinkle argues that the weight of the evidence has shifted in his favor based on materials

---

[3] As this Court made clear at oral argument, neither side gets a second bite at the apple on decisions that a prior judge in a case has made. In other words, the question is not what this Court would do in the first instance; rather, it is what this Court thinks Judge Sinatra likely would have done based on any purportedly new information given the decision that he issued earlier in the case.

4

provided in discovery, including the full law enforcement interview of Gogolack.  *See* Docket Item 299 at 3-10.  Hinkle further argues that his history and characteristics have changed based on his "exemplary behavior" during his pretrial detention.  Docket Item 299 at 10.  This Court finds that neither of these changes would have affected Judge Sinatra's decision.

First, even assuming for the sake of argument that the Gogolack interview and other discovery undermines the government's accusations that Hinkle was involved in Quinn's death, those allegations were not central to Judge Sinatra's decision.  *See* Docket Item 217 at 60 ("The Crystal Quinn proffers are worth considering, *even if they are not independently sufficient to detain the defendant*, but they are not irrelevant, for sure." (emphasis added)); *id.* ("And I'm considering the -- *for what it is worth*, the -- what I've heard here today regarding the death of Crystal Quinn and the statement about her having a bounty on her life, which is corroborated by someone other than . . . Gogolack." (emphasis added)).  In particular, regarding danger, Judge Sinatra relied on "the quantities of [marijuana] plants and firearms"; "the placement of [the] weapons"; Hinkle's dangerous "conduct when the agents were clearing his house"; and "the proffers regarding the marijuana, the text messages, the sales, . . . and the firearms in conjunction with the marijuana sales."  *Id.* at 59-60.  This Court finds that that the new information in the Gogolack interview would not have changed Judge Sinatra's calculus, which was affirmed by the Second Circuit.

Second, Hinkle's outstanding behavior while incarcerated—while indeed commendable—does not tip the scales.  More specifically, this Court finds that this recent step in the right direction does not outweigh the considerations that led to Judge

5

Sinatra's decision, including Hinkle's "questionable employment situation," his "criminal history," his "mental health and . . . substance abuse," and his "December . . . 2021 threat to kill his wife and himself." See id.

Finally, while the security that Anderson and Hinkle's son put forward might well mitigate risk of flight, it does not alter the dangerousness calculation—on which Judge Sinatra's decision ultimately rested. See United States v. Ferranti, 66 F.3d 540, 543 (2d Cir. 1995) (stating that a substantial bond "would have deterred flight, not danger"); United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991) ("The bail package offered by [the defendant], although it may reasonably assure [his] appearance . . . at trial, will not reasonably assure the safety of the community."). Indeed, Judge Sinatra did not even reach the issue of whether Hinkle was a flight risk. See Docket Item 217-2 at 61. So the offer of security would not and does not change the calculus.

## CONCLUSION

For all those reasons, the government's motion to revoke Judge McCarthy's release order is GRANTED.

SO ORDERED.

Dated:  December 13, 2024
        Buffalo, New York

                                            /s/ Lawrence J. Vilardo
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE