IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

               v.                                        23-CR-99-LJV

                                                   **(FILED UNDER SEAL)**

SIMON GOGOLACK, et al.,

                        Defendants.
_____

### <u>GOVERNMENT'S OMNIBUS RESPONSE & MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS GERACE, RONCONE, ERMIN, AND HINKLE'S DISPOSITIVE PRE-TRIAL MOTIONS</u>

TABLE OF CONTENTS

I.   Responses in Opposition to the Defendants' Motions ...................................................... 1

   A.   Mr. Gerace's Motion to Dismiss Counts 1 through 3 Pursuant to Rule 12(b)(3)(B) Should be Denied. ............................................................................................................ 1

     1.   Relevant Background .......................................................................................... 2

     2.   Relevant Legal Frameworks ............................................................................... 4

     3.   Application .......................................................................................................... 6

   B.   Mr. Gerace's Motion to Dismiss the Indictment Based on Allegations that the Government Knows the Indictment  is Premised Upon False Theories Should be Denied 13

     1.   Relevant Background ........................................................................................ 14

     2.   Legal Framework ............................................................................................. 18

     3.   Application ........................................................................................................ 19

   C.   Mr. Gerace's Motion to Dismiss Based on Prosecutorial Steering Should be Denied ............................................................................................................................ 25

     1.   Relevant background ........................................................................................ 25

     2.   Legal Framework ............................................................................................. 34

     3.   Application ........................................................................................................ 37

   D.   Mr. Gerace's Motion to Dismiss or Suppress Due to a Grand Jury Subpoena Compelling the Production from "Gerace's Investigator" Should be Denied ................. 41

   E.   Mr. Roncone's Motions to Dismiss Count 25 Should be Denied........................... 73

     1.   Relevant Background ........................................................................................ 73

     2.   Legal Framework ............................................................................................. 74

     3.   Application ........................................................................................................ 76

   F.   Mr. Roncone's Motion to Suppress the Fruits of the Search Warrants should be Denied. ........................................................................................................................... 80

     1.   Relevant Background ........................................................................................ 81

     2.   Legal Framework ............................................................................................. 83

     3.   Application ........................................................................................................ 85

   G.   Mr. Roncone's Motion to Suppress Statements he Made to Law Enforcement Should be Denied. .......................................................................................................... 86

     1.   Relevant Background ........................................................................................ 86

     2.   Legal Framework ............................................................................................. 89

   H.   Mr. Ermin's Motion to Dismiss Count 24 Should be Denied................................ 92

1.   Legal Framework ............................................................... 93

2.   Application ...................................................................... 95

I.   Mr. Ermin's Motion to Suppress the Fruits of the Search at his Residence or, Alternatively, for a *Franks* Hearing Should be Denied ........................... 99

1.   Relevant Background ........................................................ 99

2.   Legal Framework ............................................................ 101

3.   Application .................................................................... 102

J.   Mr. Hinkle's Motion to Suppress the Fruits of the Search at his Residence, or Alternatively, for a *Franks* Hearing Should be Denied ........................... 105

1.   Relevant Background ........................................................ 105

2.   Legal Framework ............................................................ 105

3.   Application .................................................................... 108

K.   Mr. Hinkle's Motion to Suppress Statements Should be Denied. ........................ 135

1.   Relevant Background ........................................................ 135

2.   Legal Framework ............................................................ 136

3.   Application .................................................................... 138

II.  Conclusion ........................................................................ 138

## I.     Responses in Opposition to the Defendants' Motions

On August 8, 2025, defendants Peter Gerace, Michael Roncone, John Ermin, and Howard Hinkle filed dispositive motions seeking either the dismissal of the indictment, the suppression of evidence, or both.  Except for Mr. Roncone's motion to suppress statements, for which the government has consented to a hearing, the motions should be denied without a hearing for the reasons set forth below.[1]

### A.     Mr. Gerace's Motion to Dismiss Counts 1 through 3 Pursuant to Rule 12(b)(3)(B) Should be Denied.

Mr. Gerace first moves to dismiss Counts 1 through 3 of the Second Superseding Indictment (the "Indictment," unless otherwise noted) pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B).  *See* Gerace Disp. Mots., at 36–54, ECF No. 545, (dated Aug. 8, 2025) (hereinafter "Gerace Disp. Mots.")  He argues that each of these counts are either "duplicitous or lack specificity."  *Id.* at 36.[2]  Sandwiched in between those claims, Mr. Gerace contends that the *Klein* conspiracy charged in Count 1 does not reach non-economic forms of fraud, such as the fraud charged here.  *See id.* at 49–53.  Finally, Mr. Gerace seeks a bill of particulars as to the co-conspirator status of Gerace Attorney 1.  *See id.* at 50–51.

These arguments should be rejected because (1) Counts 2 and 3 are not duplicative of Count 1; (2) Mr. Gerace's challenges to the *Klein* doctrine are foreclosed by Second Circuit

---

[1]     Attached to the government's motion are Exhibits A through M.  Because each of the exhibits either relates to expressly sealed material or unredacted discovery, the government asks that the motions be accepted under seal.  Furthermore, the government will transmit an unredacted version of this memorandum to the Court *ex parte* and a redacted version to the parties until the government's motion to transmit certain 6(e) material is fully adjudicated. *See* Mot. Permission to Disclose Certain Specific Rule 6(e) Material, ECF No. 589, (dated Sept. 8, 2025).

[2]     In a footnote, Mr. Gerace also urges that Counts 2 and 3 are "multiplicitous" because they incorporate by reference the allegations contained in Count 1.  Gerace Disp. Mot., at 38 n. 17.  Because Mr. Gerace does not develop this argument, it should be deemed waived.  However, to the extent the argument is considered, it should nonetheless be rejected for the same reasons that Mr. Gerace's duplicity arguments fail.

precedent; (3) Count 1 is sufficiently specific; and (4) Mr. Gerace's motion for a bill of particulars is waived.

### 1.    Relevant Background

The Indictment begins with a lengthy Introduction that explains who each defendant is, the organizations they are associated with, and the background necessary to understanding the obstruction of justice, witness tampering, and witness retaliation conspiracies charged in the first three counts. *See* Sec. Super. Indict., at 2–8, ECF No. 24, (dated Jan. 5, 2024) (hereinafter "Sec. Super. Indict."). Count 1 incorporates the Introduction's allegations by reference, and charges Messrs. Gerace, Ermin, Roncone, Knight, Hinkle, and Gogolack with (1) conspiring to obstruct justice and (2) defrauding the United States in violation of 18 U.S.C. § 371. *See id.*, at 8–31. The maximum possible penalty for this charge is a 5-year term of imprisonment. *See* 18 U.S.C. §§ 371, 1503.

Though both incorporate the allegations contained in the Introduction and Count 1 by reference, Counts 2 and 3 charge different crimes. *See id.* at 31 ¶ 1, 33 ¶ 1. Count 2 charges Messrs. Gerace, Ermin, Hinkle, and Gogolack with witness tampering conspiracy under 18 U.S.C. § 1512(k). *Id.* at 31–33. Count 3, meanwhile, charges those same defendants with witness retaliation conspiracy under § 1513(f). *See id.* at 31–34.

Each count alleges that the different conspiracies alleged encompassed multiple objects. Count 2, for instance, alleges five different conspiratorial objects:

> i.    to kill Crystal Quinn, a witness, with the intent to prevent the attendance and testimony of Crystal Quinn in Case Nos. 19-CR-227 and 23-CR-37, Federal proceedings held in the United States District Court for the Western District of New York, and with the intent to prevent communication by Crystal Quinn to a law enforcement officer of the United States relating to the commission and possible commission of a Federal offense, in violation of Title 18, United States Code, Sections 1512(a)(1) and 1512(j);

2

  ii. to use physical force against Crystal Quinn, a witness, with the intent to influence, delay, and prevent the testimony of Crystal Quinn in Case Nos. 19-CR-227 and 23-CR-37, Federal proceedings held in the United States District Court for the Western District of New York, and with the intent to hinder, delay, and prevent communication by Crystal Quinn to a law enforcement officer and judge of the United States relating to the commission and possible commission of a Federal offense, in violation of Title 18, United States Code, Sections 1512(a)(2) and 1512(j);

  iii. to use intimidation, threats, and corruptly persuade, Crystal Quinn, a witness, and to attempt to do so, with intent to influence, delay, and prevent the testimony of Crystal Quinn in Case Nos. 19-CR-227 and 23-CR-37, Federal proceedings held in the United States District Court for the Western District of New York, in violation of Title 18, United States Code, Section 1512(b)(1) and 1512(j);

  iv. to use intimidation, threats, and corruptly persuade, Crystal Quinn, a witness, and to attempt to do so, with intent to cause and induce Crystal Quinn to withhold  testimony from an official proceeding in Case Nos. 19-CR-227 and 23-CR-37, Federal proceedings held in the United States District Court for the Western District of New York, in violation of Title 18, United States Code, Sections 1512(b)(2)(A) and 1512(j); and

  v. to use intimidation, threats, and corruptly persuade, Crystal Quinn, a witness, and to attempt to do so, with intent to prevent communication by Crystal Quinn to a law enforcement officer of the United States relating to the commission and possible commission of a Federal offense, in violation of Title 18, United States Code, Section 1512(b)(3).

*Id.* at 31–33.

  If convicted of Count 2, the defendants could face a maximum potential penalty of twenty years if the jury found they threatened the use of physical force, up to thirty years if the jury found that physical force was used, and life if the jury found that the defendants intentionally caused Ms. Quinn's death.

  Similarly, the witness retaliation conspiracy alleged in Count 3 contains multiple objects:

  i. to kill Crystal Quinn, a witness, with the intent to retaliate against Crystal Quinn for her attendance at an official proceeding, namely, a Federal grand jury proceeding in Case Number 23-CR-37 in the United States District Court for the Western District of New York, in violation of Title 18, United States Code, Section 1513(a)(1)(A);

  ii. to kill Crystal Quinn, a witness, with the intent to retaliate against Crystal Quinn for providing to a law enforcement officer any information relating to the commission and possible commission of a Federal offense, in violation of Title 18, United States Code, Section 1513(a)(1)(B);

  iii. to knowingly engage in conduct and thereby cause bodily injury to Crystal Quinn, with the intent to retaliate against Crystal Quinn for her attendance as a witness in a Federal proceeding, namely a Federal grand jury proceeding in Case Number 23-CR-37 in United States District Court for the Western District of New York, and for providing information relating to the commission and possible commission of a Federal offense to a law enforcement officer, in violation of Title 18, United States Code, Section 1513(b).

*Id.* at 33–34.

  If convicted of Count 3, the defendants face up to a twenty-year term of imprisonment if the jury finds they caused bodily harm, up to a thirty-year term of imprisonment for an attempt to kill, and life in the case of death.

### 2. Relevant Legal Frameworks

*a. The Duplicity Doctrine*

Duplicity is the joining in a single count of two or more distinct and separate offenses. FED. R. CRIM. P. 12(b)(3)(B)(i) (joining two or more offenses in the same count constitutes a defect in the indictment); *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) ("An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count . . . and 2) the defendant is prejudiced thereby."); *United States v. Kandic*, --- F. 4th ---, 2025 WL 1085208, at *3 (2d Cir. 2025) (similar). "The prohibition against duplicitous indictments arises primarily out of a concern that the jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of any particular

offense." *United States v. Verrecchia*, 196 F.3d 294, 297 (1st Cir. 1999); *United States v. Knapp*, 15 F.3d 1092 (9th Cir. 1994) (Table) ("One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense." (quoting *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976))).

### b. Specificity in an Indictment

Under Federal Rule of Criminal Procedure 7, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." The indictment must be specific enough to inform the defendant of the charges and allow the defendant to plead double jeopardy in a later prosecution based on the same events. *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

"Under this test, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Maxwell*, 534 F. Supp. 3d 299, 318 (S.D.N.Y. 2021) (Nathan, J.) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). That is, "the indictment need only allege the 'core of criminality' the [g]overnment intends to prove at trial, since the indictment is 'read . . . to include facts which are necessarily implied by the specific allegations made.'" *United States v. Budovsky*, No. 13-CR-368 (DLC), 2015 WL 5602853, at *3 (S.D.N.Y. Sept. 23, 2015) (quoting *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007)).

The Second Circuit has "consistently upheld" indictments that "track the language of the statute charged" and "state the time and place (in approximate terms) of the alleged crime." *United States v. Walsh*, 194 F.3d 37, 44–45 (2d Cir. 1999) (holding that an indictment which described the victim, the manner, and the period of an alleged assault was sufficient). "[T]o raise a challenge to the specificity of an indictment within the meaning of Rule 12(b)(2),

a defendant must do more than assert in general terms that the indictment by which he . . . was charged is vague or insufficiently specific." *United States v. Crowley*, 236 F.3d 104, 109 (2d Cir. 2000). "Rather, the defendant must apprise the District Court of those particular portions of the indictment that are lacking in the requisite specificity, and explain why, in the circumstances, greater specificity is required."

### 3. Application

#### a. Counts 2 and 3 are not duplicative of Count 1

Mr. Gerace first argues that Counts 1 through 3 are duplicitous. Gerace Disp. Mots., at 40. Specifically, he contends that Count 2 and 3's incorporation of Count 1's "allegations" extends to an incorporation of Count 1's charges, effectively duplicating Count 1 across what should be three different offenses. *See id.* at 45–46. In his view, this means that a "[c]onviction on Count 1 may result in automatic conviction under Counts 2 and 3," which would significantly prejudice him because "Counts 2 and 3" carry "much harsher penalties." *Id.* at 45. He further claims that the Indictment is ambiguous as to "which overt acts pertain to which counts." *Id.* at 46. For these reasons, Mr. Gerace concludes that Counts 2 and 3 are duplicitous of Count 1 and must be dismissed.

These arguments are premised upon the conflation of allegations and charges. An allegation is "[s]omething declared or asserted as a matter of *fact*" or a "party's formal statement of a *factual* matter as being true . . ." *Allegation*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphases added). Consistent with this definition, Rule 7(c)(1) provides that "[a] count may incorporate by reference an *allegation* made in another count." FED. R. CRIM. P. 7(c)(1) (emphasis added). A charge, by contrast, is "[a] formal accusation of an *offense* as a preliminary step to a prosecution," and an "offense" is a "violation of the *law*." *Charge*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added); *Offense*, BLACK'S LAW

DICTIONARY (12th ed. 2024) (emphasis added); *see also Mathis v. United States*, 579 U.S. 500, 504 (2016) (Kagan, J.) ("At a trial, [elements] are what the jury must find beyond a reasonable doubt to convict the defendant. Facts by contrast, are mere real-world things—extraneous to the crime's legal requirements. They are 'circumstance[s]' or 'event[s] having no 'legal effect [or] consequence': In particular, they need neither be found by a jury nor admitted by a defendant." (internal quotations and citations omitted)).

Counts 2 and 3 incorporate by reference Count 1's "allegations", not its criminal offense, which is separate and distinct from the witness tampering and retaliation conspiracies respectively charged in Counts 2 and 3. *See* Sec. Super. Indict., at 31, 33 (stating that "[t]he allegations of the Introduction and Count 1 are repeated and re-alleged and incorporated herein by reference as though set forth fully herein"). Accordingly, Mr. Gerace's theory of incorporation—and, by extension, his theory of duplicity—is inconsistent with the plain meaning of the Indictment and Rule 7's use of the word "allegation." *See United States v. Haddock*, 956 F.2d 1534, 1546 (10th Cir. 1992) (holding that an indictment that alleged in "each count" that "[t]he grand jury realleges the foregoing paragraphs" did not render it duplicitous), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997); *see also United States v. Vilar*, No. 05 CR. 621 (RJS), 2008 WL 4298545, at *2 (S.D.N.Y. Sept. 5, 2008) (observing that "courts in this Circuit have consistently recognized that mere incorporation of previously alleged factual allegations does not make a count impermissibly duplicitous").

Just as fundamentally, each count clearly describes separate conduct and charges a separate offense, as evidenced by the heading of each count, its charging language, and the varying facts asserted in connection with each charge. Given these distinguishing characteristics, the risk that a jury would believe that Counts 2 or 3 duplicate Count 1—and

thus would be at risk of finding "the defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense"—is incalculably low. *Knapp*, 15 F.3d at *1. A standard jury instruction directing the jury to "consider each count separately and return a separate verdict of guilty or not guilty for each" would preempt any confusion that could possibly arise by the Indictment's incorporation of certain factual allegations. 1 Modern Federal Jury Instructions-Criminal P 3.01 (2025).

Resisting this conclusion, Mr. Gerace relies on an assortment of cases that, upon careful inspection, undermine his claims. Consider *United States v. Gosy*, where, like Mr. Gerace, the defendant urged that the indictment's reincorporation of the allegations in separate counts created a duplicity problem. The Magistrate Court expressly disagreed and determined that the incorporation by reference within certain counts of "allegations" from other counts did *not* render the indictment duplicitous. *See* Rep. & Rec., at 18–19, ECF No. 111, 1:16-CR-46, (dated Dec. 13, 2018) (hereinafter "*Gosy* Rep. & Rec."). The District Court did not disturb that decision. To the contrary, it concluded that the Magistrate Court "correctly found that the incorporation of Count 1 into Counts 149–166 does not make Counts 149–166 duplicitous." Dec. & Order, at 12, ECF No. 124, 1:16-CR-36, (dated Feb. 27, 2019) (hereinafter "*Gosy* Dec. & Order").

In addition to undermining Mr. Gerace's duplicity theory, *Gosy* illustrates the long-held maxim that "[d]uplicity does not necessarily require dismissal of an indictment." *Sturdivant*, 244 F.3d at 79. Other remedies tailored to "the stage of the proceeding at which the threatened harm or harms arise" exist. *Id.* Thus, though not finding a duplicity problem

on almost squarely analogous facts to those here, the *Gosy* Court struck as surplusage charging language that was incorporated by reference into other counts. *See Gosy* Dec. & Order, at 12.[3]

The other cases Mr. Gerace cites similarly fail to support the drastic remedy he seeks. For starters, none of *United States v. Orozco-Prada*, 732 F.2d 1076 (2d Cir. 1984), *United States v. Quicksey*, 525 F.2d 337 (4th Cir. 1975), and *Brown v. United States*, 299 F.2d 438 (D.C. Cir. 1962) contain duplicity problems. Rather, each of those three cases concerned sentencing concerns that attached to the district court's failure to use a special verdict form for counts alleging different conspiratorial objects that triggered different maximum sentences.

For example, in *Orozco-Prada*, the Second Circuit held that the absence of a special verdict form for a defendant rendered the defendant's eight-year sentence improper where the defendant was convicted of "a conspiracy under both [21 U.S.C. §] 841(b)(1)(A)," which then "covere[d] cocaine" and "authorize[d] a sentence of up to fifteen years," and "[21 U.S.C. §] 841(b)(1)(B)," which "covere[d] marijuana" and "allow[ed] a sentence of up to five years." 732 F.2d at 1083. As the court explain, "in the absence of a special verdict, there was no way for [the district court] to know whether the jury intended to convict [the defendant] for a cocaine-related conspiracy, for a marijuana-related conspiracy, or for a conspiracy involving both drugs." *Orozco-Prada*, 732 F.2d at 1083.

*Quicksey* and *Brown* adopted similar conclusions—and neither involved a finding of duplicitousness for any count at issue. *See Quicksey*, 525 F.2d at 341 (concluding that the omission of a special verdict form made it impossible "to ascertain whether the jury intended

---

[3]     For its part, the District Court adopted the Magistrate Court's parallel recommendation that the defendant's motion to strike be denied except as to certain paragraphs containing charging language. *See* Dec. & Order, at 12. Because the District Court had already agreed with the Magistrate Court that the incorporation of Count 1's allegations into the other counts did not create a duplicity problem, the government disagrees with Mr. Gerace's characterization that the striking of certain surplusage was done to "avoid a duplicity problem." Gerace Disp. Mot., at 44.

to find the defendants guilty of" the general conspiracy charged under § 371 or a more specific narcotics conspiracy"); *Brown*, 299 F.2d at 439–40 (concluded that the lack of a special verdict form left the court unable to say which conspiracy, or conspiracies, the defendants committed).

More generally, far from substantiating Mr. Gerace's claim that the incorporation of Count 1's allegations into Counts 2 and 3 irreparably prejudices him, *see* Gerace Disp. Mots., at 45–46, *Orozco-Prada*, *Quicksey*, and *Brown* underscore that trial courts possess myriad tools to help juries understand the charges, create clear and precise records, and stop unfair prejudice in its tracks. Mr. Gerace offers no reason beyond vague allusions to the Indictment's "structure" that curative instructions or other mechanisms will be insufficient to help the jury understand that Counts 1 through 3 charge entirely distinct offenses. Accordingly, the motion to dismiss as to these counts should be denied.

> ### b.    *Klein* conspiracies apply to non-economic forms of fraud

Mr. Gerace next moves to dismiss Count 1 on the basis that it charges him with a "non-economic *Klein* conspiracy"—*i.e.*, a conspiracy wherein "the government has not been defrauded of money or property." Gerace Disp. Mots., at 49–50. In Mr. Gerace's view, defrauding the government of its right to honest services, for example, falls outside the statue's scope and, therefore, is not criminal under 18 U.S.C. § 371. *See id.*

In support of his argument, Mr. Gerace cites a purportedly pending Second Circuit appeal in *United States v. Lingat*, No. 24-2328 (2d Cir. 2025) "in which the defense has urged the [Second Circuit] to pull back on the common law expansion of the *Klein* doctrine and questioned its application where the charged conspiracy does not involve a loss of money or property." *See* Gerace Disp. Mots., at 50 n.2. The appeal, however, is no longer pending: a

panel of the Second Circuit conclusively rejected the defense's invitation to narrow the scope of the *Klein* doctrine.

Specifically, the panel disagreed with the appellant's contention, echoed by Mr. Gerace, that "Section 371 should only be applied to cover conspiracies to deprive the United States of money or property, rather than mere obstruction of the administration of" governmental departments.  Sum. Order, *United States v. Lingat*, at 6, Case No. 24-2328, ECF No. 52, (dated July 8, 2025) (internal quotations omitted).  Instead, the panel concluded that "Section 371 should be broadly interpreted to reach 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government,' and 'is not confined to fraud as that term has been defined in the common law.'"  *Id.* (quoting *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012)).  Because Mr. Gerace's argument to the contrary runs headlong into binding Second Circuit precedent, his motion challenging the scope of Count 1's *Klein* conspiracy should be denied.

c. **Count 1 is sufficiently specific and Mr. Gerace's motion for a bill of particulars is waived**

Mr. Gerace also argues that Count 1 is insufficiently specific.  *See* Gerace Disp. Mots., at 50–54.  In particular, he argues that "it is unclear whether the government is alleging acts undertaken by [Gerace] Attorney 1 were acts of deceit or dishonesty for purposes of establishing the fraud element."  *Id.* at 50.  This is a problem, Mr. Gerace intimates, because "[t]he overt acts naming . . . himself are not acts of deceit and dishonesty."  *Id.*  He concludes that "[t]his lack of specificity as to what crime [he] committed is prejudicial," and thereby necessitates the dismissal of Count 1 or, alternatively, a bill of particulars.  *Id.*

These arguments are unavailing for three reasons.  First, the "crime [that Mr. Gerace] committed" is stated clearly in Count 1: he conspired with his codefendants and others to

defraud the United States and obstruct justice. *See* Sec. Super. Indict., at 8–9 ¶¶ 2(a)–(b). Mr. Gerace does not—and cannot—argue that Count 1 fails to "track the language of the statute charged" and "state the time and place (in approximate terms) of the alleged crime," which are the conditions necessary to surviving a specificity challenge. *Walsh*, 194 F.3d at 44–45. For this reason alone, his motion to dismiss Count 1 should fail.

Second, Mr. Gerace's contention that Count 1 is somehow defective on account that the overt acts in which he is named "are not acts of deceit or dishonesty" is of no moment, because even overt acts appearing "legitimate" "in isolation" may be properly included in an indictment. *United States v. Montour*, 944 F.2d 1019, 1026 (2d Cir. 1991). Just as importantly, several of the overt acts in which Mr. Gerace is named plainly lend themselves to the charged conspiracy. *See* Sec. Super. Indict., at 12 ¶¶ 7–8. In Overt Act ¶ 21, for example, Mr. Gerace announced "Fuck the rats", "All rats should die", and "No matter what, anybody can get touched because when all this is over, I have very serious people to tie up my loose ends." Sec. Super. Indict., at 15 ¶ 21. Shortly thereafter, Mr. Gerace had an in-person meeting with one of the "serious people" in his orbit, Mr. Ermin. *Id.* at 17 ¶ 29. Crystal Quinn died approximately three weeks later. Though not inherently "deceitful," these overt acts form important components of the conspiracy charged in that they reflect Mr. Gerace's announcement of his plan to obstruct justice through enlisting the assistance of other serious criminals and then meeting in-person with one of such individual weeks before Ms. Quinn died.

Third, and finally, insofar as Mr. Gerace is attempting to acquire a bill of particular to better understand Gerace Attorney 1's status in the indictment, his argument overlooks the fact that he had "an opportunity to appeal" the Magistrate Court's denial of the same in his

non-dispositive motions but "did not avail himself of that opportunity." *See* Status Conf. Tran., at 47, (dated July 31, 2025) (statement of government counsel). Mr. Gerace should not be permitted to circumvent the normal appellate process by dressing a motion for a bill of particulars in dispositive garb. Accordingly, Mr. Gerace's motion to dismiss for lack of specificity and his renewed motion for a bill of particulars should be denied.

### B.    Mr. Gerace's Motion to Dismiss the Indictment Based on Allegations that the Government Knows the Indictment is Premised Upon False Theories Should be Denied

Mr. Gerace also moves to dismiss the indictment "based on defective grand jury proceedings." Gerace Disp. Mots., at 54 (capitalization omitted). In particular, he claims that the Indictment contains numerous "fictional narrative[s]", including the following:

> (1) Mr. Gerace learned though inappropriate means that Ms. Quinn was a witness; (2) he communicated that information to Mr. Ermin and directed Ms. Quinn be killed; (3) Mr. Ermin accepted that direction and enlisted the assistance of members of the Rare Breed Motorcycle Club to carry out a plan to kill Ms. Quinn; (4) the Rare Breed Motorcycle Club then enlisted the assistance of Mr. Gogolack in the plan to kill Ms. Quinn; and (5) Mr. Gogolack gave drugs to Ms. Quinn with the purpose of killing her.

*Id.* at 56.

Mr. Gerace trains most of his focus on the first component of this so-called fictional narrative—i.e., that he "learned through inappropriate means that Ms. Quinn was a witness"—and claims that the Indictment falsely alleges that he "inappropriately learned that Ms. Quinn was a government witness" through the defendant's witness list. *Id.* (citing Sec. Super. Indict., at 24 ¶ 25). Mr. Gerace reads this allegation to mean that the defense "reveal[ed]" Ms. Quinn's status as a witness to Mr. Gerace through their own defense witness list so that the government could "advance a theory that Mr. Gerace" served as "the gatekeeper of this information and would be responsible for sharing it with other individuals."

13

*Id.* at 57. Claiming that this reading is sufficient to support a finding that the government knowingly injected "false" information in an indictment, Mr. Gerace asks this Court to dismiss the charges against him. *Id.* at 61.

Because this argument—which cites no legal authority—is premised upon a misreading of the indictment and is unsupported by the law, Mr. Gerace's motion should be denied.

### 1.    Relevant Background

The Indictment's introductory allegations claim that Ms. Quinn was charged via Criminal Complaint on February 3, 2023, in connection with threatening messages she sent to a witness against Mr. Gerace. Sec. Super. Indict., at 4 ¶ 10. Ms. Quinn began cooperating with the government, first through a proffer with the FBI held on February 16th. *Id.* ¶ 11.

That same day, the Indictment alleges as follows in Overt Act ¶ 17:

<u>Overt Acts</u>

17.    On or about February 16, 2023, knowing and having reason to know that Crystal Quinn was represented in the matter by another attorney, Gerace Attorney 1 caused an unwitting attorney, Attorney 2, to: (i) communicate with Crystal Quinn without the consent of Crystal Quinn's attorney; (ii) offer to represent Crystal Quinn in the matter in which Crystal Quinn already had an attorney; and (iii) offer to represent Crystal Quinn because Gerace Attorney 1, was "concerned that the feds might be trying to intimidate [Crystal Quinn] or even just bring [Crystal Quinn] in for questioning." Gerace Attorney 1 caused Attorney 2 to make a communication to Crystal Quinn as follows:

Omg I'm sorry to hear that hunny 😔
Where are you living now? Are you ok otherwise?
I know ███ well, great guy and great attorney. I'm guessing he's meeting you for the same concern I had as I got a call from Peter Gerace's attorney, ██████ concerned that the feds might be trying to intimidate you or even just bring you in for questioning. He saw that I was your attorney in the past and reached out to me for me to make sure you were OK and knew I'm here if you need representation.
And I want you to know I'm here even if you just need a friend as well😊

14

*Id.* at 14 ¶ 17.

Ms. Quinn testified in the Grand Jury shortly thereafter, on March 9th.  *Id.* at 4 ¶ 14.
Then, on March 13, "individuals unknown to the Grand Jury placed dead rats" on her
mother's vehicle and in the vicinity of Ms. Quinn's residence.  *Id.* at 15 ¶ 18.  Parallel to these
two allegations, the Indictment's Manner and Means section alleges, in relevant part, that
Mr. Gerace caused an attorney to text Ms. Quinn "to corruptly influence, obstruct, and
impede, and endeavor to corruptly influence, obstruct, and impede [her] from cooperating
with members of federal law enforcement" and to prevent her from testifying in the Grand
Jury.  *Id.* at 10 ¶ 5(a)(i).  Additionally, the Indictment alleges that Mr. Gerace caused "dead
rats to be placed at [Ms.] Quinn's residence" to prevent her cooperation with law enforcement
and testimony before the Grand Jury. *Id.* ¶ 5(a)(ii).

On March 23, 2023, the Grand Jury returned a four-count indictment against Mr.
Gerace charging him with three counts of witness tampering and one count of distribution of
cocaine.  *Id.* at 4 ¶ 15.  Next, on March 24th and continuing March 27, 2023, the U.S. District
Judge John L. Sinatra held detention hearings, ultimately resulting in Mr. Gerace's detention.
*See id.* at 5 ¶ 16.  Approximately 10 days later, the government moved to dismiss Ms. Quinn's
criminal complaint.  *See id.* ¶ 19.

The Indictment further alleges that Mr. Gerace, through Gerace Attorney 1,
unsuccessfully moved to reopen his detention hearing and seek pre-trial release.  *Id.* at ¶¶ 20,
23.  Fourteen days after Judge Sinatra denied Mr. Gerace's motion to reopen his detention
hearing, Gerace Attorney 1 filed a witness list containing two of the Judge's relatives, which
forced his recusal under 28 U.S.C. § 455(b)(5)(iv) and resulted in an adjournment of the trial,
which was scheduled to begin August 14, 2023.  *Id.* at 16 ¶ 24.

It is after this relevant context that the Grand Jury found as follows:

> The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness. The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of a Protective Order which prohibited attorneys for GERACE from revealing to GERACE the government's witnesses' names and from providing GERACE with the government's witness list.

*Id.* at ¶ 25.

Indeed, the Protective Order in 19-CR-227 stated, in pertinent part, that "only the parties and the Court will have access to the Government's . . . witness list . . ." Protective Order, at 1, *United States v. Bongiovanni*, 1:19-CR-227, ECF No. 347, (dated Jan. 9, 2023). The Protective Order further prohibited the defense team from "reveal[ing] the identities of any [government] witnesses to anyone, including other witnesses or third parties," though it permitted witness materials to be shared "with attorneys, investigators, and support staff assisting with the preparation of the trial." *Id.* at 4. Witness materials were not to be disclosed to the defendants, themselves. *Id.* at 3 ("[C]ounsel for Defendants shall not disclose, verbally or otherwise, the substance of any 3500 materials to their respective client/Defendants" until an agreed-upon date).

The Protective Order initially contemplated the release of witness materials in May 2023, but that date was stayed after counsel for co-defendant Joseph Bongiovanni withdrew from the case. *See* Gov. Motion to Stay and/or Modify Protective Order, *United States v. Bongiovanni*, 1:19-CR-227, ECF No. 456, (dated May 10, 2023). The District Court granted that motion and stayed until further order of the Court, the provisions of the protective order (Dkt. 347) that allow for dissemination of witness names and/or 3500 materials to Defendants. Text Order, *United States v. Bongiovanni*, 1:19-CR-227, ECF No. 458, (dated May 10, 2023). The government transmitted its witness list the same day. *See* Gov. List of

Potential Witnesses, *United States v. Bongiovanni*, 1:19-CR-227, ECF No. 462 (filed under seal May 10, 2023).

Though the district court's orders prohibited the defense team from disclosing the identities of government witnesses to their clients, both were silent as to how they could treat the identities of *defense* witnesses. *See generally* Protective Order, ECF No. 347; Text Order, ECF No. 458.

In addition to including the relatives of the District Judge who detained him, Mr. Gerace's witness ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ " as pictured below:



Def.'s Potential Witness List (Sealed), at 1, *United States v. Bongiovanni*, 1:19-CR-227, ECF No. 529, (filed under seal June 16, 2023) (highlights added).

By the time they reserved the right to call any of the government's witnesses in their own case, the defense had had the government's witness list for well over a month. Yet, notwithstanding their having reserved the right to call any witness identified on the government's list, the defense identified as defense witnesses several individuals on the

government's witness list, including Ms. Quinn *and* █████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████[4]

### 2.     Legal Framework

A court can exercise its supervisory power "to dismiss an indictment because of misconduct before the grand jury . . . where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'"[5] *United States v. Williams*, 504 U.S. 36, 46 (1992) (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment)). As *Williams* explained:

> Rule 6 of the Federal Rules of Criminal Procedure contains a number of such rules, providing, for example, that "no person other than the jurors may be present while the grand jury is deliberating or voting," Rule 6(d), and placing strict controls on disclosure of "matters occurring before the grand jury," Rule 6(e)[.]  Additional standards of behavior for prosecutors (and others) are set forth in the United States Code. *See* 18 U.S.C. §§ 6002, 6003 (setting forth procedures for granting a witness immunity from prosecution); § 1623 (criminalizing false declarations before grand jury); § 2515 (prohibiting grand jury use of unlawfully intercepted wire or oral communications); § 1622 (criminalizing subornation of perjury). . . .

---

[4]     ███████████████████████████████████████████████████ *See United States v. Gerace*, No. 21-2419, 2023 WL 3243477, at *1 (2d Cir. May 4, 2023) (affirming the district court's injunction against Mr. Gerace's "New York State civil action . . . filed against two individuals for defamation" where the two individuals were people "Gerace believe[d] [were] witnesses in th[e] criminal proceeding against him").

[5]     Prior to *Williams*, the Second Circuit held that an indictment may be invalid—and thus subject to dismissal—"(1) if the government misleads the grand jury into thinking it is receiving firsthand testimony when it is in fact receiving hearsay or (2) if there is a high probability that the defendant would not have been indicted had only nonhearsay evidence been used." *United States v. Ruggiero*, 934 F.2d 440, 444 (2d Cir. 1991). This rule does not appear in one of the "few, clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to ensure the integrity of the grand jury's function," but, rather, is the sort of "means of prescribing . . . standards of prosecutorial conduct in the first instance" before the grand jury that the *Williams* Court held exceeded the supervisor power of courts. *Williams*, 504 U.S. at 46–47. That said, no court has recognized that *Williams* may have abrogated, in part, *Ruggiero*.

*Id.* at 74 n. 6 (internal case citations omitted).

Courts may not dismiss indictments in response to challenges to their evidentiary sufficiency, because "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956); *United States v. Maceo*, 873 F.2d 1, 3 (1st Cir. 1989) ("A court should not inquire into the sufficiency of the evidence before the indicting grand jury, because the grand jury proceeding is a preliminary phase of the criminal justice process and all constitutional protections will be afforded during trial."). A contrary rule would essentially force two trials: one on "the competency and adequacy of the evidence before the grand jury" and another before a petit jury required to determine guilt beyond a reasonable doubt. *Costello*, 350 U.S. at 362–63. "This is not required by the [F]ifth [A]mendment." *Id.*

### 3.    Application

Mr. Gerace's motion to dismiss based on allegations that the government misled the Grand Jury into believing that Mr. Gerace learned of Ms. Quinn's status as a witness through the June 16th defense witness list should be denied because it (1) is premised upon a fundamental misreading of the Indictment and record and (2) is not authorized by law.

### a.    Mr. Gerace's motion to dismiss is premised on a misreading of the Indictment and the record

First, Mr. Gerace misinterprets the meaning of Over Act ¶ 25, which plainly contains the following three parts:

1. "The trial witness list filed or caused to be filed by Gerace Attorney 1 also listed Crystal Quinn as a defense witness."

2. "The listing of Crystal Quinn as a witness for Gerace circumvented the provisions of the Protective Order . . ."

> 3. The Protective Order "prohibited attorneys for Gerace from revealing to Gerace the government witnesses' names and from providing Gerace with the government's witness list."

Sec. Super. Indict., at 16 ¶ 25.

None of these allegations are false, let alone clearly false or outside the ambit of the Grand Jury's capacity to determine the facts. Starting with the first part of Overt Act ¶ 25, Gerace Attorney 1 caused the filing of Mr. Gerace's witness list, which listed Crystal Quinn as a defense witness. *See* Gerace Potential Witness List, at 36 ¶ 201. The third part of Overt Act ¶ 25 is also unmistakably true: the Protective Order did, in fact, prohibit the dissemination of witness materials, including their identities to Mr. Gerace. *See* Protective Order, at 3, ECF No. 347; Text Order, ECF No. 458. Only the second part of Overt Act ¶ 25—that is, whether the listing of Crystal Quinn circumvented the provisions of the Protective Order—is contested. Putting aside that trials exist so that the parties may contest the facts, the Grand Jury could have reasonably inferred—based on the fact that Mr. Gerace's witness list already reserved the right to ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████"; other government witnesses listed on the defense witness list, ██████████████████ ████████████████████; and other evidence at the Grand Jury's disposal related to Mr. Gerace's corrupt use of his witness list—that the listing of Ms. Quinn had the effect of circumventing the Protective Order's prohibition against disclosing the identities of government witnesses to the defendant and other third parties. *Cf. Montour*, 944 F.2d at 1026–27 (acknowledging that overt acts should be viewed in context and not in isolation).

Not only was the Grand Jury's finding factually supported and reasonable, but Mr. Gerace's reading—that Overt Act ¶ 25 alleges that the "defense team" "reveal[ed] Ms. Quinn as a government witness" through designating her as a defense witness and did so with the

intent "to" circumvent the Protective Order—is not rooted in the allegation's text. Gerace Disp. Mots., at 57.

Overt Act ¶ 25 does not allege that the defense witness list is *what* "reveal[ed]" to Mr. Gerace that Ms. Quinn was a cooperating witness. To the contrary, Overt Act ¶ 25 states that (1) the Protective Order prohibited Mr. Gerace's attorneys "from revealing" to their client the government's witness list and the names listed therein, and (2) that the listing of Ms. Quinn circumvented this restriction. *See* Sec. Super. Indict., at 16 ¶ 25. In other words, Overt Act ¶ 25 reflects that the listing of Ms. Quinn on the defense witness list effectively exploited a loophole in the Protective Order, not that it was through her listing that Mr. Gerace learned of Ms. Quinn's cooperation with the government.

Other allegations in the Indictment speak to when Mr. Gerace knew of Ms. Quinn's status as a government witness—and all predate the June 2023 filing of the defense witness list. Specifically, the Grand Jury found that Mr. Gerace and others "caus[ed] dead rats to be placed at Crystal Quinn's residence" on March 13, 2023, just days after she testified in the Grand Jury against him. Sec. Super. Indict., at 10 ¶ 5(a)(ii); 15 ¶ 18. Throughout this litigation, Mr. Gerace has failed to answer how, on the one hand, the government (or the Grand Jury) could think that Mr. Gerace engaged in witness tampering by causing the placement of dead rats at Ms. Quinn's residence in March 2023 but then, on the other, believe that he did not learn of Ms. Quinn's status as a witness until the filing of the defense witness list. Though Mr. Gerace is content to contort the Indictment to create cognitive dissonance where none otherwise exists, this Court should see the Indictment for what it is: a common sense allegation that Mr. Gerace learned of Ms. Quinn's cooperation long before the filing of

his witness list, and certainly no later than the government's detention proffer during the detention hearing held on March 24 and 27, 2023.

Mr. Gerace's next argument is equally unpersuasive. Mr. Gerace contends that the government's current argument is contrary to sworn statements made in its motion for a protective order. *See* Gerace Disp. Mots., at 60. In particular he points to the following statements:



*Id.* (emphasis original and quoting Gov. Rev'd & Super. Mot. Protective Order, at 11–12, ECF No. 156, (dated June 28, 2024)).

Mr. Gerace contends that the government's current argument—i.e., that he is misinterpreting Overt Act ¶ 25—is "blatantly inconsistent with [there] [ ] earlier sworn submission[s]." *Id.*

How? Government counsel neither alleged that counsel for Mr. Gerace identified Crystal Quinn as a government witness to Mr. Gerace nor that Mr. Gerace learned of Ms. Quinn's cooperation with the government through his counsel. Instead, consistent with the Grand Jury's finding, government counsel opined that the defense's decision to list government witnesses as defense witnesses could have " ▮▮▮▮ circumvented the protective order by identifying " ▮▮▮▮ —plural— " ▮▮▮▮▮▮ ." Gov. Rev'd & Super. Mot. Protective Order, at 12. There is no inconsistency between that

representation, the government's current argument, and the Grand Jury's independent factual finding.

Relatedly, whether the listing of Ms. Quinn on the defense's witness list identified her as a government witness does not mean that it was *through that identification* that Mr. Gerace *learned* that Ms. Quinn was a government witness.  Consider the following hypothetical, which will be familiar to all those who have worked on criminal cases: law enforcement has been investigating a series of robberies.  As part of the investigation, law enforcement has obtained (1) video footage of the robbers, (2) their fingerprints, resulting in positive matches, (3) the license plate numbers of the vehicles they used to get away, which reveals the vehicles are registered to the individuals depicted in the video, and (4) a cell phone belonging to one of the robbers containing text messages between him and his co-conspirator discussing the robberies they've committed.  Through all this information, law enforcement knows the identities of the robbers.  However, for good measure, they show a six pack of photographs to a store clerk who witnessed one of the robberies.  The store clerk positively identifies the robbers.

In this hypothetical, no one could fairly say that law enforcement learned of the robbers' identities *through* the store clerk's positive identification.  That is because, as the hypothetical demonstrates, law enforcement learned of the robbers' identities through myriad other sources of evidence.

Likewise, government counsel's reference, in a court filing separate and apart from the Grand Jury's factual determination to the defense witness's list "████████ identification of government witnesses does not mean that it was *through* that witness list that Mr. Gerace's *learned of* Ms. Quinn's cooperation with the government.  This is especially so considering, as

the indictment reflects, that it has long been the government's theory that Mr. Gerace *learned of* Ms. Quinn's cooperation long before the filing of the defense witness list (likely no later than the March 2023 detention hearings), in the same way that the hypothetical's intrepid investigators learned of the robbers' identities long before store clerk's positive identification of the robbers.

In sum, because Mr. Gerace's motion is premised upon a distorted reading of both Overt Act ¶ 25 and the record, it should be denied.

### b.    There is no legal basis to dismiss the Indictment

Mr. Gerace's motion to dismiss also fails because it is not premised upon any legal authority permitting dismissal of the Indictment. Indeed, over the course of six pages, Mr. Gerace cited precisely zero law authorizing courts to dismiss indictments on the kind of theory he advances here. *See* Gerace Disp. Mots., at 56–61.

That is because there is none. As *Williams* instructs, a court may "dismiss an indictment because of misconduct before the grand jury . . . where that misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions." *Williams*, 504 U.S. at 46 (internal quotations omitted). These "clear rules" include, but are not limited to, grand jury secrecy requirements under Federal Rule of Criminal Procedure 6 and certain criminal statutes that criminalize making false statements to the grand jury. *Id.* at 46 n.6. "Absent a violation of one of these rules by the prosecution team, a court lacks authority to dismiss an indictment." *United States v. Skelos*, 15-CR-317 (KMW), 2018 WL 2849712, at *1 (S.D.N.Y. June 8, 2018) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 260 (1988)).

Mr. Gerace does not identify any rule drafted and approved by the Supreme Court and Congress that the government violated. Instead, his argument sounds in the very kind of

"sufficiency" contest that the Supreme Court has held is better left for trial.  *See Costello*, 350 U.S. at 362–63.  Accordingly, Mr. Gerace's motion should be denied.

### C.    Mr. Gerace's Motion to Dismiss Based on Prosecutorial Steering Should be Denied

Mr. Gerace next moves to dismiss the indictment based on allegations of prosecutorial judge-shopping.  Specifically, Mr. Gerace claims that the government should have case-related its initial prosecution of defendant Simon Gogolack to his pending cases in case numbers 19-CR-227 and 23-CR-37.  *See* Gerace Disp. Mots., at 61–68.  Because the government did not file said case-related form, Mr. Gerace contends that there is an "appearance" that the government engaged in judge-shopping and that this "appearance . . . greatly undermines the credibility of the criminal justice system if not addressed" by dismissing the case.  *Id.* at 68.  In the alternative, Mr. Gerace asks this Court to "determine what information the government had elicited at the grand jury prior to the indictment of Mr. Gogolack, when it declined to file a case-related form."  *Id.*  Because Mr. Gerace's argument misstates the record, misconstrues the discovery, and is legally meritless, his motion should be denied.

#### 1.    Relevant background

#### a.    The 2023 Local Rules regarding case-related forms

In 2023, Rule 7 of the Local Rules of Criminal Procedure stated as follows:

> Upon filing of the indictment or information, each criminal case is assigned to a Judge in either Buffalo (typically, cases arising in Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming counties), or Rochester (typically, cases arising in Chemung, Livingston, Monroe, Ontario, Schuyler, Seneca, Steuben, Wayne and Yates counties). The assignment within these areas shall ordinarily be by random selection. The Court may transfer cases within the District, *sua sponte*. Parties requesting transfer of a case from Buffalo to Rochester, or vice versa, shall file a written motion requesting such

relief, returnable before the Judge to whom the case is originally assigned.

W.D.N.Y. Local R. Crim. P. 7 (2024).

The local rules did not define what it meant for a "case" to be "related" to another case. However, during this same period, the U.S. Attorney's Office would submit what are known as "case-related" forms to indicate whether a case—that is, a formal criminal prosecution initiated by a charging instrument such as a Criminal Complaint, Information, or Indictment—was "related" to another already pending charging instrument. Thus, an Indictment would generally be marked as related to an already-charged Criminal Complaint; charges brought against one co-conspirator in an already-charged conspiracy would be related to the existing co-conspirator/co-defendant; and new charges against an existing defendant would be related to his or her existing case.

### b.    Ms. Quinn's death and the search of Simon Gogolack's residence

On August 2, 2023, the United States Attorney's Office learned that Ms. Quinn died in Wellsville, New York. Mr. Gogolack had reported Ms. Quinn's death to 911 the day before–August 1, 2023. The circumstances of Ms. Quinn's death, including the location, cause, and manner, were not immediately apparent. The government immediately commenced an investigation into Mr. Gogolack, and the circumstances of Ms. Quinn's death.

On August 2, 2023, when Mr. Gogolack drove from Wellsville to Depew, New York to return Ms. Quinn's mother's car, the Depew Police Department detained him for driving with a suspended license. At that time, the FBI interviewed Mr. Gogolack and seized his phone pursuant to a federal search warrant.

On August 5, 2023, Magistrate Judge McCarthy signed a search warrant for Mr. Gogolack's Wellsville residence.  During the execution of the warrant on August 8, 2023, the FBI found drugs and firearms, including several marijuana plants.

### c.    Simon Gogolack's initial charges via Criminal Complaint

On August 17, 2023, Mr. Gogolack was initially charged in a five-count Criminal Complaint charging violations of the following statutes:

1. Title 18, United States Code, Section 922(g)(1) (felon in possession of firearm and ammunition);

2. Title 18, United States Code, Section 924(c)(1)(A)(i) (possession of firearms in furtherance of drug trafficking);

3. Title 18, United States Code, Section 922(g)(3) (unlawful user of controlled substances in possession of firearm and ammunition);

4. Title 21, United States Code, Section 856(a)(1) (maintaining a drug-involved premises); and

5. Title 21, United States Code, Section 846 (narcotics conspiracy).

Criminal Complaint, at 1, *United States v. Gogolack*, 23-MJ-1115, (dated Aug. 17, 2023).  None of the charges in Mr. Gogolack's case—that is, the criminal prosecution initiated by the Criminal Complaint—were related Ms. Quinn's death.  Nor were these charges part of the same schemes, transactions, or events charged in cases 19-CR-227 and 23-CR-37.

### d.    The first Indictment against Gogolack and the September 14, 2023, detention hearing

The Grand Jury returned a five-count indictment against Mr. Gogolack on Wednesday, September 13, 2023, that charged the same offenses as those asserted in the Criminal Complaint.  *See* Indict., at 1–5, ECF No. 12, (dated Sept. 13, 2023).  This case was randomly assigned to U.S. District Judge John L. Sinatra.

27

The next day, Mr. Gogolack was arraigned and appeared for a detention hearing. *See* Det. Hr'g Tran., at 2, (dated Sept. 14, 2023). During that detention hearing, the government proffered about Mr. Gogolack's possession of firearms; his drug distribution activities; his kidnapping of two individuals; and his efforts to tamper with the witnesses to his kidnapping:

| | |
|---|---|
| Government Counsel: | He's selling drugs, possessing firearms and body armor. That poses a serious threat to society. However, what I would like to spend some time with the Court on now is witness tampering and intimidation because — |
| The Court: | Before you do that — |
| Government Counsel: | Yeah. |
| The Court: | — he's not charged with any of that now, is he? |
| Government Counsel: | Not in this indictment, Judge. |
| The Court: | In any other indictment? |
| Government Counsel: | Judge, I would submit to the Court that that's going to be coming in the near future. |
| The Court: | Okay. Well — |
| Government Counsel: | And then there's both testimony and corroboration which you are going to see in a second about this witness tampering that occurred, and something I expect you are going to hear during the course of the detention hearing today is that the defendant offered to turn himself in or self-surrender to the FBI but this witness tampering incident and there's more than one witness tampering incident occurred after the defendant called and offered to turn himself into the FBI. |
| The Court: | Well — |
| Government Counsel: | So what we have here is reports from witnesses, multiple witnesses, more than |

28

one with corroborating evidence that between the time of the search warrant at the defendant's residence and the time of his arrest, the defendant communicated, and it says with at least one individual, I can confirm for the court now it's at least two individuals and attempted to intimidate and threaten them from communicating with law enforcement.

The Court:            All right. Well, I'll listen to your proffer in that regard, but I just want to note that he is not charged currently with witness tampering, and I'm going to take that into account in assessing all of the factors.

Government Counsel:   Well, Judge —

Defense Counsel:      Judge, this is also —

The Court:            No need to argue with me, Mr. Cooper. I said I will listen to your proffer, but I just want it noted that he's not currently charged with any of that. So go ahead.

Government Counsel:   Absolutely, Judge. So, I would ask the Court to keep open eyes and open mind to the information in front of you regardless of whether an indictment has been returned yet on these charges because obviously it takes time to present cases, bring witnesses into the Grand Jury. It's not a question of if so much as a question of when.

The Court:            I've noted your position, and you've noted my position.

Government Counsel:   Yes, Judge.

The Court:            Okay. Go ahead.

Government Counsel:   The next slide up on your screen here is a cash app payment from this defendant on August 14, and I don't know if the Court uses cash app or Venmo or these electronic payment systems —

29

| | |
|---|---|
| The Court: | None of the above. I'm sorry. |
| Government Counsel: | I'm sorry? |
| The Court: | I do not. My kids do, I'm sure. |
| Government Counsel: | So just — and I didn't mean that with disrespect. |
| The Court: | No, no. I appreciate it. |
| Government Counsel: | I just wanted to educate the Court, when you send a payment on Venmo or CashApp, you have to include a memo or a note with it. |
| The Court: | Okay. |
| Government Counsel: | So, I send you $5 and I say for coffee because you bought me a cup of coffee, I have to include that text some sort of comment. It can even be an emoji like a smiley face. |
| The Court: | Okay. |
| Government Counsel: | In this instance what we have is the defendant sending a CashApp payment to a witness and the defendant sends $1 so a nominal amount and the message is for sixth amendment. Now, this is before the defendant is even arrested by the FBI. It's after his house has been searched and it's after he's offered to turn himself in, and he's sending messages to witnesses or people he believes are witnesses against him and telling him for sixth amendment. |
| | Now, I can tell the Court that the people who received those messages didn't even know what the sixth amendment meant so they Googled it, and when they Googled it they saw that it was the right to confront your accuser, and the people who received these messages, and it's more than one person, perceived it as a threat from this defendant. |

30

*Id.* at 22–26.

Elsewhere, the government proffered about a kidnapping Mr. Gogolack committed against two individuals before linking that kidnapping to his efforts to tamper with witnesses through CashApp:

> Government Counsel:     Judge, before I get to the burden, there's additional newly developed information, and again, because the way this works, we don't always get the information the same day that a person is charged by a complaint. This is not charged in the indictment, yet, but I'm going to proffer to you now that there are multiple witnesses to an incident where the defendant used the same shotgun that you've seen in those pictures to hold a drug user against his will in the defendant's basement for upwards of three hours, that he struck that person with the spikes on the front of that shotgun.
>
> That incident was witnessed by another individual. Both of those individuals corroborate each other and describe the defendant whose wrapped himself in plastic from head to toe holding a drug user captive in his basement for over three hours. The Government is continuing to investigate that information.
>
> However, after the information came to the Government, we rereviewed the photos from the search warrant conducted at the defendant's house, and sure enough, the photos from the defendant's basement show plastic um drop cloth, essentially what painters would use, and a white plastic chair. Now, that's exactly what was described by this witness who essentially says the defendant lured him to the house by offering him drugs and then brought him down into the basement where the defendant was -- had set-up plastic from

31

floor to ceiling in a little like on three sides and a white chair and that he then shoved the person into the chair, struck the person with the shotgun and held the person against their will for hours in his basement.

The same plastic -- or the plastic chair that was described by the witnesses and the plastic drop cloth that was described by witnesses is still in the basement when law enforcement goes and photographs the house. They didn't even know that they were looking for it, but afterwards while interviewing people who've purchased drugs from the defendant, the Government becomes aware of this incredibly disturbing conduct where the defendant has used that shotgun to beat someone and essentially kidnap them by holding them against their will using the instrumentality of commerce which would be a cell phone to lure them to the house.

So, the defendant poses an obvious danger to the community. The pictures, the text messages, the threats over CashApp should all convince this Court of that by clear and convincing evidence. . . .

*Id.* at 34–36.

As should be obvious, the government's proffering about Mr. Gogolack's witness tampering at that time bore no  obvious or direct connection to any tampering a Grand Jury later determined was committed against Ms. Quinn.  In fact, to the extent the government at all discussed Ms. Quinn, it did so to provide necessary context to the evidence of Mr. Gogolack's guns and drug charges.  *See id.* at 14 (proffering about the ammunition found on the floor when law enforcement responded to Ms. Quinn's death); *id.* at 15 (proffering about a photograph of Mr. Gogolack holding a shotgun while he was with Ms. Quinn in the days before she died); *id.* at 19 (proffering that Mr. Gogolack was "texting people indicating that

he ha[d] heroin, fentanyl, or crack cocaine for sale" during the days that he was with Ms.
Quinn, who died of a drug overdose in his residence); *id.* at 21 (proffering about photographs
from Ms. Quinn's phone of Mr. Gogolack's firearms); *id.* at 27 (proffering that "[w]hen law
enforcement responded to [Ms. Quinn's death], the defendant told them that [another
individual] lived in his house and it was [the other individual's] side of the house where [Ms.
Quinn] was found dead" and that this statement "was a lie").

Six days later, on September 20, 2023, the Grand Jury returned a thirteen-count
Superseding Indictment against Mr. Gogolack, that included charges regarding Mr.
Gogolack's kidnapping and witness tampering activities, none of which related to the conduct
in cases 19-CR-227 and 23-CR-37, or at that time seemed related to Ms. Quinn's death or any
conspiracy regarding Ms. Quinn.

e.    **The Second Superseding Indictment**

Over three months later, on January 5, 2024, the Grand Jury returned a 28-count
Second Superseding Indictment against Mr. Gogolack and eight other defendants: Messrs.
Gerace, Ermin, Roncone, Knight, Hinkle, Byrd, and Barnes, as well as Cortnie Barber. *See*
Sec. Super. Indict., at 1. In relevant part, Count 1 of the Second Superseding Indictment
charged Messrs. Gogolack, Gerace, Ermin, Roncone, Hinkle, and Knight with conspiring to
defraud the United States and obstructing justice in connection with Ms. Quinn's death. *See*
*id.* at 2–31. Counts 2 and 3 charged Messrs. Gogolack, Gerace, Ermin, and Hinkle with
conspiring to tamper with, and retaliate against, Ms. Quinn by virtue of her status as a federal
witness. *Id.* at 31–34.

Because Mr. Gerace had been charged, the government case-related the Second
Superseding Indictment to his pending matters in 19-CR-227 and 23-CR-37. The case was
then assigned to Judge Vilardo, who began presiding over those cases after Mr. Gerace's

witness list containing two of Judge Sinatra's relatives forced his recusal under 28 U.S.C. § 455(b).

###### f.     The 2024 revised case-related rule

The Local Rules were amended in 2024 to reflect revisions to the case-assignment system.  Specifically, Rule 7 now states as follows:

> (a)     Upon filing of the indictment or information, each criminal case is assigned to a Judge in either Buffalo (typically, cases arising in Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans and Wyoming counties), or Rochester (typically, cases arising in Chemung, Livingston, Monroe, Ontario, Schuyler, Seneca, Steuben, Wayne and Yates counties). The assignment within these areas shall ordinarily be by random selection. The Court may transfer cases among Judges and/or within the District, *sua sponte*. Parties requesting transfer of a case from Buffalo to Rochester, or vice versa, shall file −9− a written motion requesting such relief, returnable before the Judge to whom the case is originally assigned.

> (b)     When a criminal case is related to one or more pending criminal cases, the United States Attorney's Office shall so indicate upon the filing of the indictment, information, or criminal complaint, on the Criminal Case Related Form. A criminal case shall be presumed to be related to another case when: (1) the facts of each arise out of the same charged criminal scheme(s), transaction(s), or event(s), even if the cases involve different defendants; (2) the same criminal conduct is charged in an indictment and a violation of probation or supervised release; (3) a district judge has previously handled some aspect of the case at the criminal complaint stage, such as through an appeal from a bail determination by a magistrate judge or review of a report and recommendation concerning competency; or (4) the criminal case is related to a pending civil forfeiture case. However, for purposes of this rule, a case is not presumptively related to prior wiretap applications, motions in connection with grand jury proceedings, or search warrant applications.

W.D.N.Y. Local R. Crim. P. 7(a)–(b) (2024).

###### 2.     Legal Framework

Mr. Gerace's argument implicitly invokes the doctrine of structural error insofar as he claims that the "appearance" of prosecutorial-initiated judge-shopping interferes with his

constitutional right to due process. *See United States v. Pearson*, 203 F.3d 1243, 1255 (10th Cir. 2000) (likening the defendant's argument that prosecutorial judge-shopping amounted to a structure error or a fundamental defect in the criminal prosecution); *see Greer v. United States*, 593 U.S. 503, 513 (2021) (characterizing the structural error "category" as "highly exceptional" and includes the "denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt" (second and third quote quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)). The remedy for a structural error is reversal of a conviction, not the dismissal of an indictment. *See United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000) (explaining that structural errors require reversal of a conviction). There are "a limited number of structural errors, all involving the violation of bedrock constitutional rights." *United States v. Johnson*, 117 F. 4th 28, 41 (2d Cir. 2024) (quoting *United States v. Moran-Toala*, 726 F.3d 334, 343 (2d Cir. 2013)). Structural errors interfere with the criminal *trial's* ability to "reliably serve its function as a vehicle for determination of guilt or innocence," and thus cast doubt on the fundamental fairness of any resulting punishment. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

To determine whether a structural error infects this prosecution, the Court must first look to whether there has been a "violation of bedrock constitutional rights." *Johnson*, 117 F. 4th at 41. To that end, it is well established, moreover, that "due process requires a 'neutral and detached judge in the first instance.'" *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pens. Trust*, 508 U.S. 602, 617 (1993) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)). "[A] criminal justice system in which the prosecutor alone is able to select the judge of his choice to preside at trial, even in limited types of cases, raises serious concerns about

the appearance of partiality, irrespective of the motives of the prosecutor in selecting a given judge." *Francoline v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004) (citing *Tyson v. Trigg* (*Tyson II*), 50 F.3d 436, 442 (7th Cir. 1995) (Posner, J.) (noting that "[t]he practice of allowing the prosecutor to choose the grand jury and hence the trial judge is certainly unsightly . . . [and] lack[s] the appearance of impartiality")). At the same time, "a judicial assignment system that invokes concerns about impartiality does not, by itself, deprive [the defendant] of a neutral and impartial judge presiding at trial." *Id.* at 141.

That important distinction drove the Tenth Circuit in *Pearson* to reject the defendant-appellant's claim of structural error. In that case, the Tenth Circuit assumed without deciding that prosecutorial steering of the judicial assignment system resulting in a prosecution-favored judge presiding over the defendant's trial violated the defendant's Fifth Amendment right to due process. 203 F.3d at 1259–60. Nevertheless, the Tenth Circuit rejected the defendant's claim of structural error, which it noted exists in the smallest handful of discrete cases, because "a prosecutor's choice of judges is limited": "[e]ven if a case assignment system allows the prosecutor to select the judge, the prosecutor must still choose from a group who have undergone the process of selection and appointment, who have sworn to uphold the law and defend the Constitution, and whose conduct can be scrutinized through appellate review." *Id.* at 1260–62. Thus, the Tenth Circuit could not "presume that a federal judge selected by the prosecutor will be his agent or henchman." *Id.*

Second, "a defendant who must proceed to trial before a judge selected by the prosecutor is not without remedies" because, "[i]f the judge appears biased, a defendant may file a motion for recusal." *Id.* at 1262 (citing 28 U.S.C. § 455). Consequently, the Tenth Circuit held that "a defendant in a case in which the prosecutor has selected the judge does

36

not necessarily receive a trial that 'cannot reliably serve its function as a vehicle for determination of guilt or innocence' and consequently renders any resulting punishment fundamentally unfair." *Id.* (quoting *Rose*, 478 U.S. at 577–78); *see also Tyson II*, 50 F.3d at 442 (rejecting the proposition that allowing a prosecutor to select the judge constitutes structural error).

More generally, "no court has ever held that prosecutorial 'judge shopping'—without more—is a *per se* violation of a defendant's due-process rights." *United States v. Ashrafkhan*, 821 F. App'x 428, 437 (6th Cir. 2020) (unpublished) (collecting cases). And in the same way that prosecutorial steering, without more, is insufficient to grant a new trial, *see Tyson II*, 50 F.3d at 442, no court has dismissed an indictment due to findings of prosecutorial steering, let alone the *appearance* of such steering.

### 3.    Application

Mr. Gerace's motion to dismiss should be denied for three reasons. First, the government emphatically denies that it engaged in any kind of judge shopping. The facts show that Simon Gogolack's initial narcotics and firearms charges bore no connection to Mr. Gerace's indictments in 19-CR-227 or 23-CR-37. As his Criminal Complaint makes clear, Mr. Gogolack's initial charges stemmed from the seizure of narcotics and firearm evidence from his residence and phone. *See* Criminal Complaint, at 8–16. The initial Indictment returned against Mr. Gogolack was randomly assigned to Judge Sinatra. So, far from "steering" Mr. Gogolack's case to any particular judge, the government subjected it to the Clerk of the Court's random case-assignment system, meaning that Mr. Gerace's core complaint is that the government did not steer the case to Judge Vilardo—by case-relating it to 19-CR-227 and 23-CR-37—at a time when Mr. Gerace was not even charged in connection with Ms. Quinn's death.

Mr. Gerace first attempts to counter these irrefutable facts by claiming that, because the FBI created a "sub file" for the death investigation in the larger investigative file related to the cases that were charged in 19-CR-227 and 23-CR-37, the government must have believed at the outset that Ms. Quinn's death was related to those cases. Gerace Disp. Mots., at 65.

This argument fails for several reasons. For starters, the U.S. Attorney's Office does not control how the FBI manages its computer files. Moreover, how an FBI agent opens a file in the FBI's computer system has no connection to whether prosecutors have properly filled out a case-related form pertaining to pending criminal charges. Furthermore, insofar as Mr. Gerace implicitly suggests that the case-related system required the government to relate cases due to an investigative nexus between the defendants, he cites zero authority for his claim.

Nor would such a system be practical. Most proactive investigations begin with law enforcement operating behind a veil of ignorance that is steadily lifted through the course of an investigation. Investigations, however, do not have predetermined outcomes, might take law enforcement in surprising and unanticipated directions, and may exonerate some people of wrong-doing while charging others. *Cf. Texas v. Cobb*, 532 U.S. 162, 173–74 (2001) (recognizing "the reality that police often are not yet aware of the exact sequence and scope of events they are investigating—indeed, that is why police must investigate in the first place").

Likely due to this dynamism, the 2023-era case assignment system and attendant case-related form did not ask the government whether a new charging instrument was related to an investigation potentially related to a defendant in an existing case. Not only could

38

divulging such information implicate the separation of powers and grand jury secrecy rules, but it would create a judicial assignment system driven by, in some cases, uncorroborated or unverified information, tenuous connections, and worse, investigative hunches. If the court wanted case-related chaos, few designs would outstrip the imagined system that Mr. Gerace faults the government for not adhering to.[6]

Mr. Gerace next implies that the government discussed Mr. Gogolack's witness tampering against Ms. Quinn during the September 14, 2023, detention hearing, seemingly for the similar proposition that it knew early in the investigation that Mr. Gogolack tampered with Ms. Quinn. *See* Gerace Disp. Mots., at 64 ("Yet, less than a month later, when Mr. Gogolack was indicted and a District Court Judge needed to be assigned, the government was appearing at the arraignment making public comments about witness tampering. *See e.g.* Dan Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, The Buffalo News, Sept. 14, 2023," (tiny urls omitted)).

This spurious argument is refuted by the actual record and unsupported by the news article Mr. Gerace cites. While the government proffered about Mr. Gogolack's witness tampering conduct, none of it related to his witness tampering against *Ms. Quinn*. To the contrary, the government proffered about Mr. Gogolack's witness tampering of two other government witnesses, conduct that is now charged in Counts 13 through 18 in the current Indictment. *Compare* Sec. Super. Indict., at 40–43 (outlining witness tampering charges premised upon Mr. Gogolack's "sending an intimidating, threatening, and harassing CashApp message"), *with* Det Hr'g Tran., at 25–26 (discussing the intimidating, threatening, and harassing CashApp messages Mr. Gogolack sent to multiple witnesses). As the

---

[6] For these same reasons, Mr. Gerace's motion for a review of the grand jury materials should be denied.

government's proffer made clear, those victims are not Ms. Quinn.  Likewise, The Buffalo News article to which Mr. Gerace cites for his misleading allegation references the threats Mr. Gogolack made to the witnesses, and it is clear from the surrounding context that neither of those witnesses is Ms. Quinn.  *See* Dan Herbeck, *Prosecutors say Wellsville man tampered with government witnesses*, THE BUFFALO NEWS, (dated Sept. 14, 2023) ("FBI agents believe Gogolack made threats against at least two government witnesses, Cooper said, also alleging that Gogolack sometimes uses a 'shotgun with spikes on it' to 'beat people.'").

Moreover, Mr. Gerace cites to no case in which an indictment has been dismissed due to allegations of prosecutorial steering, let alone the appearance of prosecutorial judge-shopping.  *See* Gerace Disp. Mots., at 61–68.  Nor has any case found by the government held that prosecutorial judge-shopping joins the "highly exceptional" category of errors that structurally impair a prosecution's fundamental fairness.  *See Greer*, 593 U.S. at 513; *Ashrafkhan*, 821 F. App'x at 437 (collecting cases).  That conclusion makes sense because, as *Pearson* acknowledges, judges are independent of prosecutors and a defendant can cure the appearance of impartiality by filing recusal motions pursuant to 28 U.S.C. § 455.  203 F.3d at 1261–62.  And even if prosecutorial steering was a structural error, the remedy for "structural errors", which are typically raised on appeal, is a new trial—not dismissal of the indictment.  *See Feliciano*, 223 F.3d at 111.

All other errors are assessed for prejudice.  Here, Mr. Gerace can demonstrate none.  Though the first indictment against Mr. Gogolack was randomly assigned to Judge Sinatra, by the time Mr. Gerace was charged in the Second Superseding Indictment, the government had "case-related" the indictment to Mr. Gerace's pending offenses in 19-CR-227 and 23-CR-37.  Those cases had been reassigned to Judge Vilardo, the judge Mr. Gerace had previously

secured by forcing Judge Sinatra's recusal through his witness list. Thus, the general remedy for prosecutorial steering contemplated by *Pearson*—namely, judicial reassignment—was automatically applied after the government case-related the Second Superseding Indictment to Mr. Gerace's other cases.

Finally, the government notes that even under the 2024 Local Rules, the government would not have been required to case-relate Mr. Gogolack's first two indictments to Mr. Gerace's pending cases. Mr. Gogolack's possession of narcotics and guns did not "arise out of the same charged criminal schemes, transactions, or events" charged in cases 19-CR-227 and 23-CR-37. W.D.N.Y. Local R. Crim. P. 7(b)(1). Likewise, Mr. Gogolack's conduct did not concern a violation of probation or supervised release; no district court judge had previously handled a part of the case; and there was no pending civil forfeiture. W.D.N.Y. Local R. Crim. P. 7(b)(2)–(4). Thus, even when judged against the revised case-related protocol, the government's decision to subject Mr. Gogolack's prosecution to the random case assignment system was perfectly acceptable.

### D. Mr. Gerace's Motion to Dismiss or Suppress Due to a Grand Jury Subpoena Compelling the Production from "Gerace's Investigator" Should be Denied

Mr. Gerace's last motion seeks dismissal of the indictment or, in the alternative, suppression of evidence based on the government's subpoenaing Mr. Gerace's investigator during the grand jury investigation. *See* Gerace Disp. Mots., at 69–76. Mr. Gerace contends that the government made false representations to Judge Arcara to secure Mr. Gerace's private investigator's grand jury testimony and then violated Mr. Gerace's attorney-client work-product privilege. *See generally id.* The motion should be denied. The government did not misrepresent facts to Judge Arcara. Rather, Mr. Gerace failed to carry his burden establishing that any work-product privilege existed in the first instance, just like he fails to

41

carry his burden before this Court identifying a legal basis to dismiss the Indictment or suppress the evidence.

### 1.     Relevant Background
#### a.     Attorney Steve Cohen announces that Mr. Gerace fired him

On July 15, 2023, attorney Steve Cohen filed a letter on the public docket announcing that Mr. Gerace informed him the same day "that he [was] terminating [their] professional relationship in the above consolidated cases." Ltr., at 1, ECF No. 567, 1:19-CR-227, (dated July 15, 2023). During a status conference held four days later, Mr. Cohen confirmed with the District Court he had been "fired" and "terminated". Status Conf. Tran., at 3:10, 3:15, ECF No. 566, 1:19-CR-227, (dated July 19, 2023); *see also id.* at 11:25 ("I've been fired."). Despite being terminated, Mr. Cohen was not permitted to withdraw from the case.

#### b.     The ▮▮▮▮▮▮▮▮ indicated that the private investigator did not work for him

On August 2, 2023, the government learned that Ms. Quinn was found dead on August 1, 2023, of an apparent drug overdose in Wellsville, New York. The government immediately opened an investigation into the circumstances surrounding Ms. Quinn's death. On August 4, 2023, just days after Ms. Quinn died, the District Court held a status conference to address the status of Mr. Gerace's representation, as his prior attorney, Steve Cohen, had indicated he was leaving the case. *See* Minute Entry, ECF No. 580, (dated Aug. 4, 2023). At that appearance, the government emphasized that the trial could not continue to be delayed because, among other reasons, "a key government witness has died under circumstances that are under investigation, and under circumstances where it's a witness who previously had rats placed on her vehicle at an earlier stage of this case." *See* Status Conf. Tran., at 8:13–17, ECF No. 581, (dated Aug. 4, 2023). The government continued:

> If this case had gone June 21st, and I'm not, you know, disparaging this Court certainly, or any Court, but if it had, by way of example, if it had gone June 21st, that witness would have testified already, and that information would have been evaluated by a jury, that important key information. Now they may never know about it. They may never know about it.

*Id.* at 8:21–25, 9:01–02.

This was the first time that the government publicly disclosed that Ms. Quinn had died. Almost immediately thereafter, Mr. Cohen stated that "this is the second witness who has *killed themselves* because of pressure that they were under with respect to this case which I verily believe, Your Honor, is pressure that's coming from the U.S. Attorney's Office." *Id.* at 9:13–15 (emphasis added).

Mr. Cohen did not provide any evidence to support his statement that Ms. Quinn had committed suicide—statements he later repeated to the media on television. Indeed, at the time Mr. Cohen made statements in court and to the media, the Medical Examiner had not even issued a report as to the cause of Ms. Quinn's death, which had only occurred three days earlier.

Meanwhile, as the government began to investigate Ms. Quinn's death, Mr. Gerace attempted seize upon it to gain his release on bail by arguing, in part, that Ms. Quinn's death presented a change in circumstances meriting the reopening of the detention hearing. *See* Tran. Oral Arg., at 3–6, 25, ECF No. 606, (dated Aug. 18, 2023); Reply in Support of Release, ECF No. 604, (dated Aug. 15, 2023). The Court granted that request. *See* Minute Entry, ECF No. 580, (dated Aug. 4, 2023). Mr. Gerace filed his sealed motion for release the next day. *See* Sealed Mot. for Release, ECF No. 585, (entered Aug. 9, 2023). He subsequently filed a reply memorandum on August 15, 2023. Reply Mem. in Further Support of Def.'s Mot. for Release, ECF No. 604, (entered Aug. 17, 2023). ███████████





### c.    The Grand Jury subpoena issued to the private investigator

In early November 2023, as the parties careened towards trial in 19-CR-227 and 23-CR-37, the government pursued its investigation into the circumstances surrounding Ms. Quinn's death.  By that point, the investigation indicated that Crystal Quinn was not suicidal, and that she died with enough fentanyl in her system to kill up to 400 people.  In fact, the investigation established that the information that Ms. Quinn was suicidal came from Simon Gogolack, who is now charged with giving her the drugs that killed her, and as being the originator of the false suicide narrative cover story; Mr. Cohen, who made in-court

proclamations of suicide within 72 hours of her death; and, in ██████████████ ████████████████████████████████████████████████

████████

     ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████, testified before a federal

Grand Jury, and disavowed the notion that Ms. Quinn was suicidal and other statements

attributed to them in the affidavits. ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████.

     As a result, ███████████████ was subpoenaed to testify before the Grand Jury

investigating Ms. Quinn's death on November 8, 2023.[7] ████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████.

     **d.    The prelude to the ████████████████**

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[7] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████





**e.**

---

[8]     Page number references for this document refer to the PDF page number.  The document, itself, does not contain page numbers.

48



*Id.* at 5.







**f.**







**g.** ██████████████████████████████████
██████

████████████████████████████████████

████████████████████████████████████████

██████████████████████  ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

████████████████████████████████.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████.[13]

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[12]    This recording was produced in discovery.

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

### h.    Mr. Gerace's Motion to Dismiss and for Sanctions in 19-CR-227 and 23-CR-37

On June 5, 2024, Mr. Gerace filed a motion to dismiss the indictments and for sanctions in case numbers 19-CR-227 and 23-CR-37, replicating in large part the arguments he presses here.  *See* Mot. Dismiss & Sanctions, ECF No. 996, 1:19-CR-227, (dated June 5, 2024) (seeking dismissal of the indictment and sanctions against the government, in part, due to the government's subpoenaing of a defense investigator in the instant case and arguing that the government misled Judge Arcara).  The District Court denied Mr. Gerace's motion to dismiss and reserved decision on his motion for sanctions related to the government's subpoenaing of private investigator ████████.  *See* Text Order, ECF No. 1164, 1:19-CR-227, (dated Aug. 30, 2024).  In early 2025, counsel for Mr. Gerace advised the government that he intended to seek a decision from the District Court regarding its reserved decision on his motion for sanctions; government counsel encouraged him to file a motion.

Approximately six months later, Mr. Gerace has yet to file a motion in 19-CR-227 and 23-CR-37 and has instead apparently sought a second bite of the same apple in front of a different audience.  Mr. Gerace has never filed a motion seeking sanctions against the government in front of Judge Arcara, the judge whom he claims the government fraudulently induced into denying his motion to quash.

### 2.    Legal Frameworks

#### a.    Prosecutorial Misconduct before the Grand Jury

As noted *supra*, a court can exercise its supervisory power "to dismiss an indictment because of misconduct before the grand jury . . . where that misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions." *Williams*, 504 U.S. at 46 (internal quotations omitted).

#### b.    The Grand Jury, Attorney-Client Privilege, and Waivers of, and Exceptions to, the Privilege

A grand jury is "charged with the responsibility of determining whether or not a crime has been committed," *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991), and "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950).  *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423–24 (1983) (noting that a grand jury holds "broad powers" to collect evidence through judicially enforceable subpoenas).

In carrying out these responsibilities, a grand jury may "inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *R. Enterprises, Inc.*, 498 U.S. at 297; *see also Branzburg v. Hayes*, 408 U.S. 665, 701 (1972) ("A grand jury investigation 'is not fully carried out until every

available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970))). Indeed, "*nowhere* is the public's claim to each person's evidence *stronger* than in the context of a valid grand jury subpoena." *In re Grand Jury Proceedings*, 219 F.3d 175, 186 (2d Cir. 2000) (emphases added) (citation omitted). That is because "[w]ithout thorough and effective investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution, or to screen out charges not warranting prosecution." *Sells Eng'g, Inc.*, 463 U.S. at 424. These fundamental goals of the criminal justice system are "accomplished *only* if the grand jury has access to the data it needs to decide whether it should return an indictment." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 186 (2d Cir. 2007).

For these reasons, the Second Circuit has cautioned that "privilege claims that shield information from a grand jury proceeding or a criminal trial are not to be 'expansively construed, for they are in derogation of the search for truth.'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 185 (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 384 (2004)).

On that score, it is not the government's burden to *disprove* the applicability of a privilege. Rather, "[t]he party invoking" the privilege bears the "heavy burden" of "establishing its applicability." *Id.* To establish an attorney-client privilege, "a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). "Work product" is a subset of material—namely documents and other tangible items—that may be encompassed within this broader privilege. *See* FED. R. CIV. P.

26(b)(3)(A); *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947).  The work product doctrine "'protects not only materials which are prepared by attorneys themselves, but also by their agents,' which include 'those who are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation.'"[14]  *Klosin v. E.I. du Pont de Nemours & Co.*, 561 F. Supp. 3d 343, 348 (W.D.N.Y. 2021) (Wolford, C.J.) (quoting *Costabile v. Westchester, New York*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008)).  "When evaluating whether to order disclosure of work product, courts have consistently distinguished between primarily factual work product and 'core' [opinion] work product," and "[a]lthough factual work product is subject to disclosure once the required showings are made, core work product is entitled to more stringent protection, protection described by some courts as 'absolute' or 'near absolute.'"  *Id.* at 349 (quoting *Crosby v. City of New York*, 269 F.R.D. 267, 277–78 (S.D.N.Y. 2010) (alterations original)).

A party cannot establish the elements of a privilege "by mere conclusory or *ipse dixit* assertions."  *S.E.C. v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 144 (S.D.N.Y. 2004); *see von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) ("That burden is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.").  Instead, claims of privilege, including claims that certain

---

[14]    "Establishment of an agency relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F.Supp.2d 217, 225 (S.D.N.Y.2013) (quotation marks, alterations, and citations omitted); *see also* RESTATEMENT (SECOND) OF AGENCY § 1. Control by the principal of the agent is of "paramount" "importance" in determining if an agency relationship exists. *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 613, 2004 WL 112948, at *5 (S.D.N.Y. Jan. 22, 2004); *see also Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir.2003). "Control is established when the principal prescribes what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times." *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F.Supp.2d 239, 258 (S.D.N.Y. 2009) (quotation marks and alteration omitted). The Motion to Quash did not attempt to satisfy these requirements.

documents or material fall within the ambit of the fact-work-product privilege, must be "specific" and "descriptive." *Beacon Hill*, 231 F.R.D. at 144 (internal quotations omitted).

Even if the party establishes the fact-work-product privilege, a grand jury is nevertheless "entitled" to the subpoenaed information "where the government shows that the grand jury has a 'substantial need' for the materials and that it has 'exhausted other means of obtaining the relevant information it seeks.'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 186 (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 192 (2d Cir. 2000)); *see also In re Grand Jury Subpoenas Dated June 5, 2008*, 329 F. App'x 302, 303 (2d Cir. 2009) (unpublished) (noting that the privilege applicable to "fact work product . . . can be overcome if the government shows that the grand jury has a substantial need for" the material and "has exhausted other means of obtaining the relevant information" (internal quotations omitted)).

The work product protection can also be waived when the party invoking the privilege elects to put the privileged materials "at issue." As the Supreme Court noted when a party used his private investigator as a witness:

> by electing to present the investigator as a witness, [defendant] waived the privilege with respect to matters covered in his testimony. Respondent can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

*United States v. Nobles,* 422 U.S. 225, 239–40 (1975); *see also John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003) ("The loss of the privilege in these circumstances is sometimes described as implied waiver, [or] sometimes as "at issue" waiver because it results from the party having placed a contention at issue . . ." (internal citations omitted)), *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (noting that, because "the attorney-client privilege cannot at once be used as a shield and a sword" . . . . "the privilege may be implicitly

waived when defendant asserts a claim that in fairness requires examination of protected communications"); *In re Perrigo Co.*, 128 F.3d 430, 445 (6th Cir. 1997) (Moore, J., concurring in part and dissenting in part) ("Like the attorney-client privilege, work-product immunity may be implicitly waived by, for example, affirmative testimonial use of the work product to advance the claimant's interests.").

Apart from waiver, "[i]t is well-established that" material "that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to [ ] communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). A party seeking to invoke the crime-fraud exception must "demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications" or work-product "were in furtherance thereof." *Id.*

### c.    Rule 26.2

Rule 26.2 of the Federal Rules of Criminal Procedure state as follows:

> (a) Motion to Produce. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.
>
> (b) Producing the Entire Statement. If the entire statement relates to the subject matter of the witness's testimony, the court must order that the statement be delivered to the moving party.
>
> (c) Producing a Redacted Statement. If the party who called the witness claims that the statement contains information that is privileged or does not relate to the subject matter of the witness's testimony, the court must inspect the statement in camera. After excising any privileged or unrelated portions, the court must order delivery of the redacted statement to the moving party. If the defendant objects to an excision,

the court must preserve the entire statement with the excised portion indicated, under seal, as part of the record.

FED. R. CRIM. P. 26.2(a)–(c).

### 3. Application

Mr. Gerace's motion to dismiss based on prosecutorial misconduct related to the government's subpoenaing of ███████████ or, in the alternative, for suppression of the recording should fail for five reasons. First, the facts do not support Mr. Gerace's claim of government misconduct, as the government neither falsely represented nor omitted information to the District Court. Instead, Mr. Gerace failed to establish his burden, and, in any event, the Grand Jury had a substantial need for the fact work-product. Second, Mr. Gerace identifies no authority, controlling or otherwise, to support the extraordinary and drastic relief of dismissing the indictment. Third, Mr. Gerace waived any fact work-product privilege involving ███████████ interviews of ████████████████████ when he put their ██████████████ in issue in his motion for pre-trial release. Fourth, there is probable cause that ████████████ work-product was done in furtherance of a crime or fraud, which vitiates any privilege claim levied by Mr. Gerace. And, finally, the recording is very likely disclosable under Rule 26.2. Accordingly, the motion should be denied.

### a. The government did not commit misconduct when Mr. Gerace failed to carry his burden in establishing that ████████████ fact work product was privileged.

First, the factual premise of Mr. Gerace's motion—that the government made false representations to Judge Arcara or, in the alternative, omitted information for Judge Arcara's consideration—is inaccurate. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

Though Mr. Gerace bore the burden of establishing through non-conclusory means that his attorney-client privilege encompassed ████████ August 11, 2023, ████████ ██████████████████ his counsel did not state with specificity that █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ *See In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 185 (observing that the party invoking the privilege bears the burden of establishing it); *Constr. Prods. Rsch., Inc.*, 73 F.3d at 473 (identifying the three elements the party invoking the privilege must satisfy before a court will deem the material privileged); *von Bulow by Auersperg*, 811 F.2d at 146 (explaining that the burden of establishing the privilege cannot be "discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.").

To the contrary, ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ █ ████████████████████████████████████

---

15
████████████████████████████████████████████████
█████████████████████████████████



Moreover, no attorney for either Mr. Gerace or ██████████ felt it necessary to (a)

produce a privilege log or (b) seek the District Court's *in camera* inspection of the purportedly



privileged materials to determine whether any privilege applied.  *See Sulaymu-Bey v. City of New York*, 372 F. Supp. 3d 90, 93 (E.D.N.Y. 2019) ("To properly demonstrate that a privilege exists, the privilege log should contain a brief description or summary of the contents of the document, the date the document was prepared, the person or persons who prepared the document, the person to whom the document was directed, or for whom the document was prepared, the purpose in preparing the document, the privilege or privileges asserted with respect to the document, and how each element of the privilege is met as to that document." (quoting *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 594 (W.D.N.Y. 1996))).[17]  For all these reasons,



██████████████████████████████████████████████████

████████████████████████████████████████ *In re Grand*

*Jury Subpoena Dated July 6, 2005*, 510 F.3d at 185; *see also id.* (noting that "privilege claims that

shield information from a grand jury proceeding or a criminal trial are not to be 'expansively

construed, for they are in derogation of the search for truth'" (quoting *Cheney*, 542 U.S. at

384)).

        In that same vein, the government committed no misconduct in failing to apprise the

District Court when, ████████████████████████████████████

████████████████████████████████████  ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████  Thus, it is of no moment if a fact work product privilege did apply to ████████████

██████████████  because the Grand Jury was entitled to such evidence any way.

Accordingly, the government did not commit any misconduct vis-à-vis the District Court

when such information emerged during ████████████████████████.[18]

        Because Mr. Gerace's allegations of government misconduct fail on the facts, his

motion to dismiss or, in the alternative, for suppression, should be denied.

---

[18]        The one judge to whom Mr. Gerace has not asserted a claim of government misconduct is Judge Arcara, the very judge he argues before this Court was victimized by the government's misconduct. If Mr. Gerace believes that the government committed misconduct in front of Judge Arcara, he should file a motion in case number ████████████.

**b.    Assuming *arguendo* that the government inappropriately subpoenaed ███ ████████, dismissal of the Indictment is improper.**

Even assuming *arguendo* that the government inappropriately subpoenaed ███

████ dismissal of the Indictment is inappropriate.  As previously noted, a court can

exercise its supervisory power

> to dismiss an indictment because of misconduct before the grand jury . . . where that misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.

*Williams*, 504 U.S. at 46 (internal quotations omitted).

Mr. Gerace fails to identify any authority to support the disfavored remedy of

dismissing the Indictment.  Of the few courts to have addressed allegations of privilege

violations at the grand jury stage of a criminal proceeding, counsel has found none that have

embraced the drastic relief Mr. Gerace seeks here.  *See United States v. Colasurdo*, 453 F.2d 585,

596 (2d Cir. 1971) (noting, in an appeal where the defendant-appellants argued that the "grand

jury had before it evidence obtained in violation of the attorney-client privilege" that, "[e]ven

if correct, appellants' assertions would not be grounds for dismissing the indictment"); *United

States v. Kingston*, 971 F.2d 481, 491 (10th Cir. 1992) (noting both that "even if Appellant can

show that an important privilege or right . . . , was violated during the grand jury stage of a

criminal prosecution, the indictment will not be dismissed unless Appellant can show

prejudice" and that "even if Appellant's attorney-client privilege were breached . . . before

the grand jury, such a breach does not bar the prosecution from proceeding altogether; it

simply bars the prosecution from presenting the tainted evidence at trial");  *United States v.

Rondeau*, No. 92-CR-0080L, 2012 WL 1900553, at *1 (W.D.N.Y. May 24, 2012) ("Even

crediting defendant's allegations as true, the alleged violations of the attorney-client privilege

before the grand jury do not rise to the level of Governmental misconduct that merits dismissal of the indictment in this case."); *United States v. Ahmad*, 14-164, 2014 WL 3500239, at *2 (E.D. Va. July 15, 2014) (denying defendant's motion to dismiss the indictment, which alleged disclosure of attorney-client privileged materials to grand jury, because the defendant did not show that any such disclosure "substantially influenced the grand jury to indict").

Because there is no legal basis to dismiss the Indictment, his motion to dismiss should be denied.

    c.    **Mr. Gerace's motion also fails because he waived any privilege claim over ███████████ work product when he put ███████████ interview of ███████████ in issue.**

Mr. Gerace's motion also fails because he waived any claim of privilege over ███ ███████ recording of ███████████████████ when he put ███████████ investigative activity at issue in his motion for pre-trial release. Specifically, Mr. Gerace used ███████████ interviews of ███████████ as a "sword" in his effort to obtain pre-trial release before Judge Vilardo, on the heels of Judge Sinatra's recusal and Ms. Quinn's death. *See* Reply Mem. in Support Def.'s Mot. for Release, at 7 ███████████ ████████████████████████████████████████████ ████████████████████████; *id.* at 8 ███████████████ ████████████████████████████████████████████ ███████████ █████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████ ████████ ████████████████████████████████████████████ ████████████████████████ ███████████

███████████████████████████████████████████

█████████████████████████

By premising his motion for release, in part, on ██████████ interviews of █████

███████████████████ Mr. Gerace took an "affirmative step[] to inject" purportedly

"privileged materials into the litigation," *In re Grand Jury Proceedings*, 219 F.3d at 187, to

"advanc[e] a claim to [the] court," *John Doe Co.*, 350 F.3d at 303. Mr. Gerace cannot now

use the fact work-product privilege as a "shield", *Bilzerian*, 926 F.2d at 1292, to "withhold

from a litigation adversary materials that the adversary might need to effectively contest or

impeach the claim," *John Doe Co.*, 350 F.3d at 303.

Thus, in *Nobles*, the district court concluded, and the Supreme Court agreed, that the

government was entitled to a private investigator's reports about his interviews with a witness

where the defendant intended to call the private investigator as a witness at trial. 422 U.S. at

229, 239–40. The Court noted that the defendant "c[ould] no more advance the work-product

doctrine to sustain a unilateral testimonial use of work-product materials than he could elect

to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-

examination . . .". *Id.* at 239–40.

Similarly, in *Bilzerian*, the defendant appealed the district court's denial of the

defendant's motion in *limine* seeking to protect his attorney-client privilege where the

defendant sought to introduce testimony that he made a good faith attempt to comply with

securities law based on his advice of counsel. 926 F.2d at 1291–92. The Second Circuit

affirmed the district court's decision, and concluded that the defendant had waived the

privilege, because the defendant's proposed testimony "would have put his knowledge of the

law and the basis for his understanding of what the law required in issue." *Id.* at 1292. "His

68

conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent." *Id.* Accordingly, the Second Circuit affirmed the trial court's decision concluding that the defendant would waive his attorney-client privilege if he put his good faith in issue. *See id.* at 1294.

The courts' reluctance to elevate the privilege at the expense of fundamental fairness animated both decisions:

> In the courts' perception, it would be unfair to force the prosecutor to run the risk that the jury would accept the defendant's claims as to the facts the defendant put in issue while allowing the defendant, by assertion of his privileges, to deny the prosecutor access to directly pertinent material that might effectively impeach the defendant's claims.

*John Doe Co.*, 350 F.3d at 303.

Those same principles militate in favor of finding waiver here. Mr. Gerace used ███████████████████████ statements, based on their interviews with ██████████, to seek pre-trial release. He therefore put ████████████ interviews of ████████████ ████████████ "at issue" in the litigation unfolding in 19-CR-227 and 23-CR-37. At that moment, the government had the right to obtain the underlying materials to impeach Mr. Gerace's claims.

The issue of ████████████ work product only became more pronounced when the Grand Jury ████████████████████████████████████ ████████████████████████████████████ ████████████. At the time that the Grand Jury subpoenaed ████████████, Mr. Gerace should not have been permitted to conceal the truth about his interviews by hiding behind a privilege he freely forfeited when attacking the government and agitating for pre-trial release.

Because Mr. Gerace waived his privilege over ███████████ recording of ████████ ████████████ the Court should deny his motion to suppress.

### d. The recording should not be suppressed because the crime-fraud exception vitiates Mr. Gerace's claim of privilege.

Lastly, Mr. Gerace's motion to suppress the recording fails because the crime-fraud exception vitiates any claim of privilege. To properly invoke the crime-fraud exception, the government must first "demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed" and then show that the "communications were in furtherance thereof." *In re Richard Roe, Inc.*, 68 F.3d at 39–40.[19]

Both elements are satisfied. █████████████████████████ ██████████████████████████████████ *See* Reply Mem. in Support Def.'s Mot. for Release, ECF No. 604. ████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

---

[19]    The Second Circuit has recognized that if "the very act of litigating is alleged to be in furtherance of a fraud," courts are to apply "a more stringent probable cause standard," and the party seeking disclosure "must show probable cause that the litigation or an aspect thereof had little or no legal or factual basis and was carried on substantially for the purpose of furthering the crime or fraud." *In re Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 F. App'x. 13, 14–15 (2d Cir. 2015) (unpublished) (internal quotations omitted); *see id.* (affirming the district court's finding that a tax protest "based on a false, undocumented transaction" and "as part of a strategy to further conceal that tax fraud and shirt his tax liabilities" was not subject to the attorney-client privilege); *United States v. Tucker*, 254 F. Supp. 3d 620, 624 (S.D.N.Y. 2017) (concluding that a "sham lawsuit" was not subject to the attorney-client privilege). Though the facts of this case undoubtedly satisfy this heightened standard, it does not apply here because the crime or fraud is not "the very act of litigating" but evidence submitted to the District Court in connection with existing litigation.

██████████████████████████████████████████████████████

████████████████

The Grand Jury then ███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████. Reply Mem. Ex. 2,

at 3; *see* Sec. Super. Indict., at 26 ¶ 77 ("On or about August 11, 2023, Investigator 1

simultaneously interviewed Crystal Quinn's mother and her mother's friend.  During the

interview Crystal Quinn's mother and her mother's friend specifically denied that Crystal was

suicidal prior to her death."). ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

As such, there is probable cause to believe that evidence submitted in federal court was

falsified or that a party attempted to obstruct a federal proceeding using falsified evidence.

*See* 18 U.S.C. §§ 1503(a), 1512(c).  The communications, documents, and recording were in

"furtherance thereof" because they were part of an effort to mislead the District Court as it

considered Mr. Gerace's motion for pre-trial release. *In re Richard Roe, Inc.*, 68 F.3d at 39–40.

The conclusion is confirmed by the Grand Jury's finding that Gerace Attorney 1 "caused

Crystal Quinn's mother and her mother's friend to sign affidavits containing things they never

said" and later "prepared an affidavit for himself which contained false and misleading

statements about his relationship with" ██████████ "and the manner in which the

statements from Crystal Quinn's mother and her mother's friend were obtained." Sec. Super.

Indict., at 26 ¶¶ 79–80. *United States v. Tucker*, 245 F. Supp. 3d 620, 624 (S.D.N.Y. 2017)

(concluding that a grand jury's return of an indictment supports a finding of probable cause

for the purposes of the crime fraud exception). Because the crime-fraud exception applies to

the recording, and to ███████████elated testimony, there is no basis in privilege to sustain

Mr. Gerace's motion to suppress. Accordingly, the motion should be denied.

### e. The motion to suppress should be denied because the recording will likely need to be produced under Rule 26.2.

Though Mr. Gerace's motion to dismiss and to suppress should be denied for all the

reasons stated *supra*, it should further be denied because the recording is likely discoverable

under Rule 26.2 of the Federal Rules of Criminal Procedure. Specifically, Rule 26.2(a)

provides that the court "must order an attorney for the . . . defendant . . . to produce, for the

examination and use of the moving party, any statement of the witness that is in their

possession and that relates to the subject matter of the witness's testimony," provided the

defendant has called that witness as one of his own. FED. R. CRIM. P. 26.2(a). To the extent

that Mr. Gerace adopts ███████████████████ as his own witnesses at trial to elicit

evidence about Ms. Quinn's mental state and her treatment by the government, he would

have to turn over the recording, as it "relates to the subject matter" of such testimony. *Id.*

To the extent Mr. Gerace intends to argue that the recording is exempt from Rule 26.2's disclosure rule, his argument is unpersuasive. "Rule 26.2 contains no general work-product exception." *United States v. Wallace*, 326 F.3d 881, 885 (7th Cir. 2003). Though Mr. Gerace could avail himself of Rule 26.2(c)'s *in camera* inspection provision, doing so would still require him to submit the full recording to the Court for a determination of which parts, if any, contain privileged fact work-product. Because courts typically conduct a Rule 26.2 analysis during motions in *limine*, the instant motion to suppress could also be denied as premature. That said, the government maintains that the motion should be denied for the other bases asserted herein.

Accordingly, for all the reasons stated herein, Mr. Gerace's motion to dismiss or, in the alternative, to suppress, should be denied.

### E.    Mr. Roncone's Motions to Dismiss Count 25 Should be Denied.

Defendant Michael Roncone moves to dismiss Count 25 of the Second Superseding Indictment. *See* Roncone Disp. Mots., at 5, ECF No. 536, (dated Aug. 8, 2025) (hereinafter "Roncone Disp. Mots."). Drawing on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), Mr. Roncone levies an "as-applied" challenge to the charge's constitutionality, arguing that the statute is not analogous to any founding-era restriction on firearm possession. *See* Roncone Disp. Mots., at 6–8. Because § 922(g)(3) reflects one of the narrow circumstances in which the government may burden the constitutional right to bear arms, Mr. Roncone's motion should be denied.

### 1.    Relevant Background

Count 25 charges Mr. Roncone with being an unlawful user of a controlled substance in possession of firearms at the time of his arrest, on December 7, 2023. *See* Sec. Super.

Indict., at 46–47.  In particular, the Indictment alleges that Mr. Roncone possessed the following firearms:

> (i)  Springfield Armory by HS Product, model Hellcat, 9 X 19 caliber semi-automatic pistol, bearing serial number BY524165;
>
> (ii)  Springfield Armory, model Range Officer Elite, .45 caliber semi-automatic pistol, bearing serial number LW168920; and
>
> (iii)  Chinese type 56 SKS Carbine, 7.62 X 39mm caliber semiautomatic rifle, bearing serial 1803870.

*See id.*

The evidence at trial will establish that Mr. Roncone was historically a drug dealer and a narcotics user, and, at minimum, a user of both marijuana and cocaine, at the time he possessed the firearms.

### 2.  Legal Framework

### a.  Pre-Trial As-Applied Challenges

Notably, Mr. Roncone raises an "as-applied" challenge to the constitutionality of § 922(g)(3) pre-trial, in the absence of any trial facts concerning his conduct.  *See* Roncone Disp. Mots., at 6 ¶ 14 ("This statute is unconstitutional as applied to Mr. Roncone.").  To assess Mr. Roncone's "as-applied" challenge, the court must analyze "the facts of [his] particular case to determine whether the application" of § 922(g)(3) "deprived" Mr. Roncone "of a protected right."  *Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) (*quoting Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006)).  Facial challenges, by contrast, aver that "no set of circumstances exists under which the [law] would be valid."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

### b.  *Bruen's* Two-Step Framework

In *Bruen*, the Supreme Court set out the test governing Second Amendment challenges to an Indictment.  *Bruen*, 597 U.S. at 19.  First, courts must first determine whether the

Amendment's "plain text covers an individual's conduct." *Id.* at 18. If so, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24; *see also id.* at 18 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest.").

*Bruen* further instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," although not necessarily dispositive, "that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. "Likewise, if earlier generations addressed th[at same] societal problem, but did so through materially different means," such also weighs against a modern regulation's constitutionality. *Id.* at 26–27. However, the Court emphasized, the inquiry into historical analogues required by *Bruen's* second step is not a "regulatory straightjacket." *Id.* at 30. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*

In *United States v. Rahimi*, the Supreme Court recognized that our Nation's tradition of firearm regulation permits the "temporary disarmament" of persons who pose a "clear" danger of "misusing firearms." 602 U.S. 680, 690, 699 (2024); *see Kanter* v. *Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."). *Rahimi* involved one element of that tradition: "prohibition[s] on the possession of firearms by those found by a court to present a threat to others." 602 U.S. at 698.

75

This case involves a different element: "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," limited to the duration of that danger. *Rahimi*, 602 U.S. at 698. "[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to public safety"—including loyalists, rebels, and persons convicted of certain crimes. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); *see id.* at 454–58. American legislatures continued to enact such laws after the founding, restricting the possession of arms by groups such as persons of unsound mind, vagrants, and fugitives. *See* Gov't Br. at 24–26, *Rahimi*, *supra* (No. 22-915) (collecting statutes).

### 3.    Application

In his as-applied challenge, Mr. Roncone asks the Court to conclude that § 922(g)(3) does cannot constitutionally be applied to him, a so-called "simple drug user." Roncone Disp. Mots., at 6. Mr. Roncone contends that the closest historical analog would be Founding-era laws disarming the mentally ill. *See id.* But, he claims, because the indictment does not allege that Mr. Roncone was impaired because of his drug use, that analog does not apply. *See id.* These arguments fail for two reasons.

First, § 922(g)(3) complies with the Second Amendment. Specifically, § 922(g)(3) targets a cate-gory of persons who pose a clear danger of misusing firearms: habitual users of unlawful drugs. Moreover, Section 922(g)(3) bars their possession of firearms only temporarily and leaves it within their power to lift the restriction at any time; anyone who stops habitually using illegal drugs can resume possessing firearms. Founding-era history, post-ratification history, and precedent all support the congressional judgment underlying that restriction. Three types of historical laws are relevant here: vagrancy laws, civil-commitment laws, and surety laws.

Laws prohibiting vagrancy "have been a fixture of Anglo-American law at least since the time of the Nor-man Conquest." *City of Chicago* v. *Morales*, 527 U.S. 41, 103 (1999) (Thomas, J., dissenting). During the 18th century, many American legislatures classified "common drunkards" as vagrants, subjecting them to imprisonment or confinement in workhouses.[20] States continued to enact such laws through the 19th century, including during the period surrounding the adoption of the Fourteenth Amendment.[21] A prominent 19th-century criminal-law treatise recognized that multiple States had enacted "statutes against being a common drunkard." 2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 267, at 196 (1859). And toward the end of the century, the Supreme Court described the "restraint" of "habitual drunkards" as a well-established aspect of the States' power to protect "public safety, health, and morals." *Lawton* v. *Steele*, 152 U.S. 133, 136 (1894).

Other jurisdictions addressed alcohol abuse through civil-commitment laws rather than criminal vagrancy laws. Over the course of the 19th century, Congress (legislating for the District of Columbia) and multiple States enacted laws providing for "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as "lunatics." *Kendall* v. *Ewert*, 259 U.S. 139, 146 (1922) (citation and quotation omitted omitted).[22]

---

[20]    *See* Act of Oct. 1727, *The Public Records of the Colony of Con-necticut from May, 1727, to May, 1735, inclusive* 128 (Charles J. Hoadly ed., 1873); Act of June 29, 1700, ch. 8, § 2, 1 *Acts and Re-solves of the Province of Massachusetts Bay* 378 (1869); Act of May 14, 1718, ch. 15, 2 *Laws of New Hampshire* 266 (Albert Stillman Batchellor ed., 1913); Act of June 10, 1799, §§ 1, 3, *Laws of the State of New-Jersey* 473-474 (1821).

[21]    See Act of Dec. 15, 1865, No. 107, § 1, 1865-1866 Ala. Acts 116; Act to Establish a Penal Code § 1014, *Revised Statutes of Arizona* 753-754 (1887); Act of Feb. 14, 1872, § 647, 2 *The Codes and Statutes of the State of California* 1288 (Theodore H. Hittell ed., 1876); Act of Feb. 4, 1885, § 1, 1884-1885 Idaho Terr. Gen. Laws 200; Act of Feb. 22, 1825, ch. 297, § 4, 1825 Me. Pub. Acts 1034; Act of Feb. 22, 1881, § 1, 1881 Mont. Terr. Laws 81-82; Act of Mar. 7, 1873, ch. 114, § 1, 1873 Nev. Stat. 189-190; Act of June 2, 1871, No. 1209, § 2, 1871 Pa. Laws 1301-1302; Act of Mar. 15, 1865, ch. 562, §§ 1-2, 1865 R.I. Acts & Resolves 197; Act of Feb. 18, 1876, § 378, *The Compiled Laws of the Territory of Utah* 647 (1876).

[22]    *See, e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William M. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code pt. 2, tit. 2, ch. 3,

Surety laws, meanwhile, originated more than a millennium ago and were "[w]ell entrenched in the common law." *Rahimi*, 602 U.S. at 695. Under those laws, magistrates could compel certain persons who posed a risk of future misbehavior to post bond. *See id.* A person who failed to post bond would be jailed, while a person who posted bond and then misbehaved would forfeit the bond. *See id.* Importantly for present purposes, surety laws extended to "common drunkards." 4 William Blackstone, *Commentaries on the Laws of England* 256 (10th ed. 1787). American justice-of-the-peace manuals from the founding era explained that magistrates could re-quire "common drunkards" to post bond for good behavior.[23]

Section 922(g)(3) resembles those historical laws in both "why and how" it burdens arms-bearing conduct. *Rahimi*, 602 U.S. at 698. Like its historical precursors, § 922(g)(3) addresses the risks posed by persons who habitually use intoxicating substances. Courts defined a "drunkard" as "one who is in the habit of getting drunk." *State* v. *Pratt*, 34 Vt. 323, 324 (1861). Section 922(g)(3) similarly applies to individuals who are in the habit of using unlawful drugs. If anything, Section 922(g)(3) rests on an even stronger justification than laws about drunkards. Habitual users of drugs, which are unlawful, pose a greater danger than

---

Art. 2, § 1803, at 358 (R.H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 95 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 68 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

[23]    *See* Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 406 (2d ed. 1792) (N.H.); James Parker, *Conductor Gen-eralis* 422 (1764) (N.J.); James Parker, *Conductor Generalis* 348 (Hugh Gaine prtg. 1788) (N.Y.); James Parker, *Conductor Gen-eralis* 348 (Robert Campbell prtg. 1792) (Pa.).

habitual users of alcohol, which was legal at the founding and remained legal for most of American history.

The burden that § 922(g)(3) imposes also fits within our country's regulatory tradition. Vagrancy and civil-commitment laws subjected drunkards to confinement in prisons, workhouses, or asylums. *Rahimi* reasoned that, if "imprisonment was permissible to respond" to a problem at the founding, then "the lesser restriction of temporary disarmament" will often also be permissible to respond to a similar problem today. 602 U.S. at 699; *see id.* at 772 (Thomas, J., dissenting) ("imprisonment involved disarmament"). Surety laws similarly imposed temporary restrictions on drunkards' rights. *Rahimi* concluded that the burden imposed by surety laws is comparable to the burden of "temporary dis-armament." *Id.* at 699 (majority opinion).

Section 922(g)(3), moreover, provides more robust procedural protection than its historical forbears. *See Rahimi*, 602 U.S. at 696 (treating procedural protection as an aspect of the burden). Founding-era vagrancy laws allowed a justice of the peace to determine, in a summary criminal proceeding, whether the defendant was a drunkard. *See District of Columbia* v. *Clawans*, 300 U.S. 617, 624 (1937). Civil-commitment laws and surety laws provided for the adjudication of the defendant's status in a civil proceeding. *See*, *e.g.*, *Rahimi*, 602 U.S. at 696-697. Under § 922(g)(3), by contrast, respondent has a right to a full criminal trial in which the government bears the burden of proving to a jury, beyond a reasonable doubt, that he was a habitual user of an unlawful drug when he possessed the firearm.

In sum, the category regulated by § 922(g)(3), habitual drug users, is closely analogous to another category, habitual drunkards, that was subject to similar or more onerous restrictions at the founding. That history suffices to establish the statute's constitutionality.

79

*Second*, for the same reasons as discussed above, the indictment does not need to allege that Mr. Roncone was impaired on the precise date and time that he possessed the firearms. It is enough to show that he was a habitual drug user, which the evidence at trial will permit the jury to conclude. Accordingly, Mr. Roncone's motion to dismiss should be denied.

### F.    Mr. Roncone's Motion to Suppress the Fruits of the Search Warrants should be Denied.

Mr. Roncone next moves to suppress all items seized and evidence derived from the search warrants executed on (1) his residence; (2) the RBMC clubhouse in Wellsville, NY; and (3) the RBMC clubhouse in Buffalo, NY.[24]   *See* Roncone Disp. Mots., at 7–8.   In conclusory fashion, Mr. Roncone contends that "the application did not provide probable cause to search the location and that the warrant never should have been signed." *Id.* at 8 ¶ 24.   Moreover, he argues that the supporting affidavit reflects "sheer speculation based on some facts which are not in and of themselves criminal in nature" and others that came from informants and witnesses. *Id.* ¶ 25.   Without identifying which facts are allegedly false, Mr. Roncone avers that some are "not true" and, more generally, complains that there was "an insufficient showing in the application that those informants and witnesses were reliable." *Id.*

Mr. Roncone's arguments as to each property fail because the search warrant was supported

---

[24]        To establish Fourth Amendment standing, the defendant must establish "[a]n objectively reasonable expectation of privacy—one that society is ready to recognize as reasonable—is one that the law accepts." *United States v. Murray*, 352 F. Supp. 3d 327, 333 (S.D.N.Y. 2019).  The government disputes that Mr. Roncone established an objectively reasonable expectation of privacy over the Buffalo–RBMC clubhouse.  Mr. Roncone does not allege that he is the owner of the club or that he was a guest in the clubhouse at the time of the search.  Thus, to the extent the Second Circuit has recognized an objectively reasonable expectation of privacy attaching to guests of a premises, Mr. Roncone cannot avail himself of that authority.  *See United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1998) ("[W]hen a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any articles therein of which the hotel lawfully takes possession.").  Nor can the defendant claim that a privacy interest transferred to him by virtue of his status as an overnight guest.  That said, because the defendant does not delineate which purportedly intentionally misleading statements bear on the probable cause for which of the three premises he asserts standing over, the government assesses each of the defendant's arguments on the merits.

by probable cause and the government relied in good faith on the validity of the search warrant.

### 1.    Relevant Background

On December 7, 2023, law enforcement searched the following pertinent properties pursuant to a federal search warrant:

(i)    ████████████, Lancaster, NY, Mr. Roncone's personal residence;

(ii)    The trailer located north of and in between ████████████, Wellsville, NY, the RBMC-Wellsville clubhouse; and

(iii)    ████████████, Buffalo, NY, the RBMC-Buffalo clubhouse.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ *Id.* at 13–14 ¶ 30.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

[REDACTED]

### 2.      Legal Framework

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. AMEND. IV.  In accordance with this constitutional right, "[c]ourts have . . . developed the 'exclusionary rule'—which requires trial courts to exclude unlawfully seized evidence from criminal trials—as the 'principal judicial remedy to deter Fourth Amendment violations.'"  *United States v. McKenzie*, 13 F.4th 223, 231 n.5 (2d Cir. 2021) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).

"[I]n the context of a warrant-based search, [courts] accord substantial deference to the finding of an issuing judicial officer that probable cause exists, limiting [their] inquiry to whether the officer had a substantial basis for [the] determination." *United States v. Jones*, 43 F.4th 94, 109 (2d Cir. 2022). The probable cause standard requires only a demonstration of "a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Silva*, 146 F. 4th 183, 189 (2d Cir. 2025) (quoting *District of Columbia v. Wesby*, 582 U.S. 48, 57 (2018)).

However, "[a] determination that the warrant at issue was not supported by probable cause to search . . . does not automatically dictate the suppression of all physical evidence seized or statements derived therefrom," because "suppression is 'our last resort, not our first impulse.'" *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011) (quoting *Herring v. United States*, 555 U.S. 135, 140 (2009)); *see also Herring*, 555 U.S. at 141 (explaining that "the exclusionary rule is not an individual right and applies only where it 'results in appreciable deterrence'" (alteration adopted) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984))). Where the government obtained the evidence "in objectively reasonable," good faith "reliance on a subsequently invalidated search warrant," courts do not require its exclusion. *See Leon*, 468 U.S. at 922.

Finally, to the extent that a defendant seeks to challenge the validity of the search warrant by alleging that it contained "intentional or reckless, material misrepresentations or omissions in the underlying search warrant affidavit," he must do so in a "substantial" and non-conclusory manner. *United States v. Lahey*, 967 F. Supp. 2d 698, 708 (S.D.N.Y. 2013) (citing *Southerland v. City of New York*, 681 F.3d 122, 126–27 (2d Cir. 2012)). By that same token, a "defendant may not rely on 'bald assertions,'" to obtain a hearing on his motion to

suppress. *United States v. Thomas*, No. 7:23-CR-00481-NSR-1, 2025 WL 1733273, at *2 (S.D.N.Y. June 23, 2025) (quoting *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998)).

### 3. Application

Mr. Roncone's motion should fail for three reasons. First, Mr. Roncone's blanket, conclusory assertion that the affidavit "did not provide probable cause to search the locations", Roncone Disp. Mots., at 8 ¶ 24, without any citation to the factual record or legal analysis, is insufficient to overcome to search warrant's presumptive validity. *See Lahey*, 967 F. Supp. 2d at 708; *Thomas*, 2025 WL 1733273, at *2. On this basis alone, Mr. Roncone's motion should be denied.

Second, the search warrants for all three premises from which Mr. Roncone seeks to suppress evidence were supported by probable cause. The searches of the clubhouse were supported ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████  ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

Those same allegations, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████    Accordingly, should the Court reach the merits

of Mr. Roncone's arguments, it should nevertheless deny his motion.

Third, and finally, Mr. Roncone does not—and cannot—claim that the government

did not rely in good faith on the Magistrate Court's issuance of the warrant, which was

supported by a detailed 69-page affidavit and even more detailed 141-page signed exhibit.

There is no legitimate, record-supported claim that the affiant of the search warrant

"knowingly misled" the Magistrate Court; that the Magistrate Court wholly abandoned his

judicial role; that the 200+ page application was "so lacking in indicia of probable cause as to

render reliance upon it unreasonable" or that the warrant, itself, was facially deficient. *United*

*States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015).  Accordingly, Mr. Roncone's motion to

suppress should be denied.

### G.    Mr. Roncone's Motion to Suppress Statements he Made to Law Enforcement Should be Denied.

Mr. Roncone also moves to suppress any statements he made to law enforcement on

December 7, 2023.  *See* Roncone Disp. Mots., at ¶¶ 28–31.  Mr. Roncone moves to suppress

the statements because he claims that he was subjected to custodial interrogation without

being Mirandized, and further that the statements were involuntary.  *Id.* at ¶ 30.  To that end,

Mr. Roncone filed two affidavits disputing material issues of fact as to whether he was in

custody at the time he made statements to law enforcement.  *Id.*  Though the government has

consented to a hearing, the government nonetheless believes that the motion should be denied

for the reasons that follow.

### 1.    Relevant Background

On December 7, 2023, at approximately 6:00 a.m., law enforcement executed a search

warrant at 4995 William Street, Lancaster NY, Mr. Roncone's residence.  When the warrant

was executed, Mr. Roncone was temporarily detained and removed from the premises.  FBI Special Brian Burns and NYSP Investigator Geraldo Rondon introduced themselves to Mr. Roncone and displayed their credentials to him.  Special Agent Burns and Investigator Rondon removed Mr. Roncone's handcuffs and explained that he had been temporarily detained for safety purposes when the warrant was executed.  Special Agent Burns advised Mr. Roncone that he was not under arrest and that he did not have to speak with investigators.  Special Agent Burns and Investigator Rondon transferred Mr. Roncone to Investigator Rondon's vehicle because it was cold and raining outside.  The investigators explained to Mr. Roncone the reason that the search was being conducted at his residence, and Mr. Roncone made several statements to them during the conversation about his association with co-defendants Howard Hinkle and Frank Knight, as well as his involvement in poker games in Wellsville.  Mr. Roncone told the agents that there were no drugs or explosives in his residence, but that there were firearms—some of which were his—for which he had a permit.  Mr. Roncone also made statements about the electronic devices in the home, and about his cell phone being seized by agents.

Mr. Roncone also made statements about his knowledge regarding Crystal Quinn's death, including the following quotes memorialized by Special Agent Burns in his report:

- "Frank called me about the girl."

- "Me and Frank messaged each other about her I do not know her at all."

- Roncone indicated that he had heard about "the girl after she died."

- Roncone stated words to the effect of *Simon is crazy on drugs and out of his mind*.

- "I don't know anything about the girl's death."

Mr. Roncone also answered questions about the property on Alma Hill, indicating that it was utilized by Rare Breed members and was acting as the new clubhouse for the Rare Breed.

After making all the aforementioned statements, Mr. Roncone indicated that he did not want to answer any more questions and that he wanted his lawyer. Mr. Roncone was then handcuffed and left in Investigator Rondon's vehicle. At about 6:45 a.m., agents provided Mr. Roncone with a phone to call his employer and advise that he would be late for work. At around 7:11am, Special Agent Burns returned to the vehicle and displayed a phone to Mr. Roncone. Mr. Roncone confirmed it was his phone and Special Agent Burns unlocked it, commenting that it was not password protected. Mr. Roncone stated that he had "nothing to hide." Agents placed the phone (for which they had a warrant authorizing seizure) in "Airplane mode" and returned to continue searching the residence.

Special Agent Burns then returned to the vehicle, to advise Mr. Roncone that evidence of illegal narcotics usage had been found along with firearms in his residence. Special Agent Burns showed Mr. Roncone a picture of the evidence. Special Agent Burns advised Mr. Roncone that a baggie with drug residue had been found in a drawer in his bedroom. Mr. Roncone commented that the credit card found among the narcotics paraphernalia was in the name of J█████ Roncone. Special Agent Burns replied to that by asking Mr. Roncone if he was suggesting that the drug paraphernalia on the tray belonged to his father. Mr. Roncone replied, "keep my father out of it" and admitted that he [Mr. Roncone] used a card that was just laying around.

On August 20, 2025, after Mr. Roncone filed his motion to suppress and supporting affidavits, the parties appeared before this Court for oral argument and a status conference, and the government consented to conducting a hearing to determine the admissibility of the

statements made by Mr. Roncone. The government expects to establish, at said hearing, that at the time Mr. Roncone made statements to law enforcement, he was not in custody for *Miranda* purposes. However, the government only intends to introduce, on its case in chief, the statements made by Mr. Roncone before he requested an attorney. The government does not intend to use the additional statements that Roncone made to law enforcement after requesting an attorney during its case-in-chief but would only seek to introduce said statements to impeach Mr. Roncone should he testify inconsistently with those statements at trial.

### 2.    Legal Framework

For the *Miranda* advice-of-rights requirements to be triggered, the defendant must be subjected to "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). Warnings are not required where "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present." *Id.* In determining whether a defendant is in custody for *Miranda* purposes, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."). "This inquiry focuses upon the presence or absence of affirmative indications that the defendant was not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

The test is an objective one, based upon the perspective of a reasonable person in the suspect's position. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). Thus, a police officer's subjective, "unarticulated plan" to detain a suspect does not render the suspect in custody for *Miranda* purposes. *Id.*; *see also United States v. Kirsteins*, 906 F.2d 919, 923 (2d Cir. 1990)

(suspect's subjective belief that he was not free to leave is irrelevant; question is what a reasonable person would have believed). The meaning of custody under *Miranda* is narrower than the meaning of a "seizure" under the Fourth Amendment. *See United States v. Schaffer*, 851 F.3d 166, 175-76 (2d Cir. 2017) (defendant was not in custody even though he was denied permission to leave; "not every seizure constitutes custody for purposes of *Miranda"); see also United States v. Santillan*, 902 F.3d 49, 61-62 (2d Cir. 2018) (even though stop was "prolonged" and defendant was directed to wait in the back of police car , "[o]n the balance, this stop bore a much greater similarity to a traffic stop or *Terry* stop than to the type of custodial interaction that would trigger the requirement of *Miranda* warnings.").

Absent a formal arrest, courts "rarely conclude" that a suspect questioned at home is in custody for *Miranda* purposes. *United States v. Faux*, 828 F.3d 130, 135-36 (2d Cir. 2016) (suspect was not in custody when questioned at home for two hours while agents executed search warrant where she was told she was not under arrest, questioning was "largely conversational," and agents did not show firearms or make threats.) The police do not place a suspect in custody by forbidding entry to a specific location, where the suspect is otherwise free to come and go. *See United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995).

In *Michigan v. Summers*, the Supreme Court held that a valid search warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. 692, 705 (1981). A detention of this sort is permitted because (1) it creates conditions for an orderly search; (2) it protects the police; and (3) it makes flight more difficult if incriminating evidence is discovered. *Id.* at 702-03; *see also L.A. County v. Rettele*, 550 U.S. 609 (2007) (naked couple roused from bed and forced to stand motionless for one to two minutes during the execution of a search for four suspects, because it protected

the deputies executing the warrant from potential weapons concealed in the bed.).  The

authority to detain established by *Summers* "must be limited to the immediate vicinity of the

premises to be searched." *Bailey v. United States*, 568 U.S. 186, 199 (2013).  The Second Circuit

has noted that use of handcuffs at one point during an encounter is not dispositive on the

question of custody for *Miranda* purposes.  *See United States v. Cota*, 953 F.2d 753, 758–59 (2d

Cir. 1992) (concluding that the defendant was not in custody where the "initial use of guns

and handcuffs [were] necessitated by the officer's safety, but the handcuffs were removed as

soon as ... the perceived safety threat abated"); *see also United States v. Familetti*, 878 F.3d 53,

61 (2d Cir. 2017) (the defendant's "initial restraints cannot establish a state of custody for the

duration of his interactions with the police.").

A defendant challenging the voluntariness of a confession has the right to "a fair

hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno*, 378 U.S.

368, 377 (1964).  The issue is whether the conduct of law enforcement officials "was such as

to overbear [the accused's] will to resist and bring about confessions not freely self-

determined." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); see also *Green v. Scully*, 850 F.2d

894, 900 (2d Cir. 1988) ("Is the confession the product of an essentially free and unconstrained

choice by its maker?").  The voluntariness of a statement made by a defendant must be

assessed based upon the totality of the circumstances.  *See United States v. Bye*, 919 F.2d 6, 9

(2d Cir. 1990).  The prosecution bears the burden of showing voluntariness.  *See Colorado v.

Connelly*, 479 U.S. 157, 168–69.  The inquiry centers around "(1) the characteristics of the

accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials."

*Green* 850 F.2d at 900.

Historically, the principal cases in which coercion has been found have involved truly outrageous conduct by the police, such as beating the defendant, *see Brown v. Mississippi*, 297 U.S. 278 (1936); administration of a "truth serum," *see Townsend v. Sain*, 372 U.S. 293 (1963); depriving the defendant of food and holding him in a "sweat box," *see Brooks v. Florida*, 389 U.S. 413 (1967); threatening to take the defendant's ailing wife into custody, *see Rogers*, 365 U.S. at 534; or to deprive the defendant of her welfare benefits and custody of her children, *see Lynumn v. Illinois,* 372 U.S. 528 (1963). More recently, the Second Circuit found government conduct sufficiently coercive to render a confession involuntary in situations such as continuing to question a suspect who was actively overdosing on drugs, *see United States v. Taylor*, 745 F.3d 15, 25 (2d Cir. 2014); where a suspect was told that if he asked for a lawyer he would be prohibited from cooperating with the government, *see United States v. Anderson*, 929 F.2d 96, 100–02 (2d. Cir. 1991); or where a prosecutor told a suspect, accurately though unrealistically, that he faced "a possible sentence of a hundred years.", *see United States v. Duvall*, 537 F.2d 15, 25 (2d Cir. 1976).

The government anticipates that a hearing will develop facts establishing that no such outrageous government conduct occurred here, and that Mr. Roncone's statements to law enforcement were voluntary. Additionally, the government anticipates that a hearing will establish that the statements Mr. Roncone made before requesting to speak with an attorney occurred while he was not in custody for the purposes of *Miranda*.

### H.     Mr. Ermin's Motion to Dismiss Count 24 Should be Denied.

Defendant John Ermin moves to dismiss Count 24 of the Second Superseding Indictment charging him with possession of firearms or ammunition as a drug user in violation of Title 18, United States Code, Sections 922(g)(3) and 924(a)(8), arguing that, as it is applied to him, it violates the Second Amendment to the United States Constitution. *See*

Ermin Disp. Mot., at ¶ 6, ECF No. 540 (dated Aug. 7, 2025) (hereinafter Ermin Disp. Mot.). Mr. Ermin essentially argues that, although he admitted the marijuana was for recreational use, because he was not obviously high at 6am when the search warrant was executed, the statute should not apply to him.  *See* Ermin Disp. Mot. at ¶ 13.  For reasons like those stated *supra*, Sec. I(E)(3), Mr. Ermin's motion should be denied.

      **1.**    **Legal Framework**

      **a.**    **Pre-Trial As-Applied Challenges**

Like Mr. Roncone, Mr. Ermin raises an "as-applied" challenge to the constitutionality of § 922(g)(3) pre-trial, in the absence of any trial facts concerning his conduct.  *See* Ermin Disp. Mot. at ¶ 6.  To assess Mr. Ermin's "as-applied" challenge, the court must analyze "the facts of [his] particular case to determine whether the application" of § 922(g)(3) "deprived" Mr. Ermin "of a protected right." *Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) (*quoting Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006)).  Facial challenges, by contrast, aver that "no set of circumstances exists under which the [law] would be valid." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

      **b.**    *Bruen's* **Two-Step Framework**

In *Bruen*, the Supreme Court set out the test governing Second Amendment challenges to an Indictment.  *Bruen*, 597 U.S. at 19.  First, courts must first determine whether the Amendment's "plain text covers an individual's conduct."  *Id.* at 18.  If so, "the Constitution presumptively protects that conduct," and "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24; *see also id.* at 18 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest.").

*Bruen* further instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," although not necessarily dispositive, "that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. "Likewise, if earlier generations addressed th[at same] societal problem, but did so through materially different means," such also weighs against a modern regulation's constitutionality. *Id.* at 26–27. However, the Court emphasized, the inquiry into historical analogues required by *Bruen's* second step is not a "regulatory straightjacket." *Id.* at 30. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.*

In *United States v. Rahimi*, the Supreme Court recognized that our Nation's tradition of firearm regulation permits the "temporary disarmament" of persons who pose a "clear" danger of "misusing firearms." 602 U.S. 680, 690, 699 (2024); *see Kanter* v. *Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."). *Rahimi* involved one element of that tradition: "prohibition[s] on the possession of firearms by those found by a court to present a threat to others." 602 U.S. at 698.

This case involves a different element: "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," limited to the duration of that danger. *Rahimi*, 602 U.S. at 698. "[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to public safety"—including loyalists, rebels, and persons convicted of certain crimes. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); *see id.* at 454–58. American legislatures continued to enact such laws after the

founding, restricting the possession of arms by groups such as persons of unsound mind, vagrants, and fugitives.  *See* Gov't Br. at 24–26, *Rahimi*, *supra* (No. 22-915) (collecting statutes).

### 2.    Application

In his as-applied challenge, Mr. Ermin asks the Court to conclude that § 922(g)(3) cannot constitutionally be applied to him, a so-called "recreational" drug user.  Ermin Disp. Mot. at ¶¶  8–23.  Mr. Ermin claims that because the indictment does not allege that Mr. Ermin was impaired because of his drug use, the historical analogs do not apply to him.  *See id.*  These arguments fail for two reasons.

First, § 922(g)(3) complies with the Second Amendment.  Specifically, § 922(g)(3) targets a category of persons who pose a clear danger of misusing firearms: habitual users of unlawful drugs.  Moreover, § 922(g)(3) bars their possession of firearms only temporarily and leaves it within their power to lift the restriction at any time; anyone who stops habitually using illegal drugs can resume possessing firearms. Founding-era history, post-ratification history, and precedent all support the congressional judgment underlying that restriction. Three types of historical laws are relevant here: vagrancy laws, civil-commitment laws, and surety laws.

Laws prohibiting vagrancy "have been a fixture of Anglo-American law at least since the time of the Norman Conquest." *City of Chicago* v. *Morales*, 527 U.S. 41, 103 (1999) (Thomas, J., dissenting). During the 18th century, many American legislatures classified "common drunkards" as vagrants, subjecting them to imprisonment or confinement in workhouses.[25]  States continued to enact such laws through the 19th century, including during

---

[25]        *See* Act of Oct. 1727, *The Public Records of the Colony of Connecticut from May, 1727, to May, 1735, inclusive* 128 (Charles J. Hoadly ed., 1873); Act of June 29, 1700, ch. 8, § 2, 1 *Acts and Re-solves of the Province of*

the period surrounding the adoption of the Fourteenth Amendment.[26]   A prominent 19th-century criminal-law treatise recognized that multiple States had enacted "statutes against being a common drunkard."  2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 267, at 196 (1859).  And toward the end of the century, the Supreme Court described the "restraint" of "habitual drunkards" as a well-established aspect of the States' power to protect "public safety, health, and morals."  *Lawton* v. *Steele*, 152 U.S. 133, 136 (1894).

Other jurisdictions addressed alcohol abuse through civil-commitment laws rather than criminal vagrancy laws.  Over the course of the 19th century, Congress (legislating for the District of Columbia) and multiple States enacted laws providing for "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as "lunatics." *Kendall* v. *Ewert*, 259 U.S. 139, 146 (1922) (citation and quotation omitted omitted).[27]

---

*Massachusetts Bay* 378 (1869); Act of May 14, 1718, ch. 15, 2 *Laws of New Hampshire* 266 (Albert Stillman Batchellor ed., 1913); Act of June 10, 1799, §§ 1, 3, *Laws of the State of New-Jersey* 473-474 (1821).

[26]       See Act of Dec. 15, 1865, No. 107, § 1, 1865-1866 Ala. Acts 116; Act to Establish a Penal Code § 1014, *Revised Statutes of Arizona* 753-754 (1887); Act of Feb. 14, 1872, § 647, 2 *The Codes and Statutes of the State of California* 1288 (Theodore H. Hittell ed., 1876); Act of Feb. 4, 1885, § 1, 1884-1885 Idaho Terr. Gen. Laws 200; Act of Feb. 22, 1825, ch. 297, § 4, 1825 Me. Pub. Acts 1034; Act of Feb. 22, 1881, § 1, 1881 Mont. Terr. Laws 81-82; Act of Mar. 7, 1873, ch. 114, § 1, 1873 Nev. Stat. 189-190; Act of June 2, 1871, No. 1209, § 2, 1871 Pa. Laws 1301-1302; Act of Mar. 15, 1865, ch. 562, §§ 1-2, 1865 R.I. Acts & Resolves 197; Act of Feb. 18, 1876, § 378, *The Compiled Laws of the Territory of Utah* 647 (1876).

[27]       *See, e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (District of Columbia); Ark. Rev. Stat., ch. 78, § 1, at 456 (William M. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code pt. 2, tit. 2, ch. 3, Art. 2, § 1803, at 358 (R.H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 95 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, 68 *Ohio General and Local Laws and Joint Resolutions* 68 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

Surety laws, meanwhile, originated more than a millennium ago and were "[w]ell entrenched in the common law." *Rahimi*, 602 U.S. at 695. Under those laws, magistrates could compel certain persons who posed a risk of future misbehavior to post bond. *See id.* A person who failed to post bond would be jailed, while a person who posted bond and then misbehaved would forfeit the bond. *See id.* Importantly for present purposes, surety laws extended to "common drunkards." 4 William Blackstone, *Commentaries on the Laws of England* 256 (10th ed. 1787). American justice-of-the-peace manuals from the founding era explained that magistrates could require "common drunkards" to post bond for good behavior.[28]

Section 922(g)(3) resembles those historical laws in both "why and how" it burdens arms-bearing conduct. *Rahimi*, 602 U.S. at 698. Like its historical precursors, § 922(g)(3) addresses the risks posed by persons who habitually use intoxicating substances. Courts defined a "drunkard" as "one who is in the habit of getting drunk." *State* v. *Pratt*, 34 Vt. 323, 324 (1861). Section 922(g)(3) similarly applies to individuals who are in the habit of using unlawful drugs. If anything, Section 922(g)(3) rests on an even stronger justification than laws about drunkards. Habitual users of drugs, which are unlawful, pose a greater danger than habitual users of alcohol, which was legal at the founding and remained legal for most of American history.

The burden that § 922(g)(3) imposes also fits within our regulatory tradition. Vagrancy and civil-commitment laws subjected drunkards to confinement in prisons, workhouses, or asylums. *Rahimi* reasoned that, if "imprisonment was permissible to respond" to a problem at the founding, then "the lesser restriction of temporary disarmament" will often also be

---

[28]        *See* Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 406 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 422 (1764) (N.J.); James Parker, *Conductor Generalis* 348 (Hugh Gaine prtg. 1788) (N.Y.); James Parker, *Conductor Genralis* 348 (Robert Campbell prtg. 1792) (Pa.).

permissible to respond to a similar problem today. 602 U.S. at 699; see *id.* at 772 (Thomas, J., dissenting) ("imprisonment involved disarmament"). Surety laws similarly imposed temporary restrictions on drunkards' rights. *Rahimi* concluded that the burden imposed by surety laws is comparable to the burden of "temporary disarmament." *Id.* at 699 (majority opinion).

Section 922(g)(3), moreover, provides more robust procedural protection than its historical forbears. *See Rahimi*, 602 U.S. at 696 (treating procedural protection as an aspect of the burden). Founding-era vagrancy laws allowed a justice of the peace to determine, in a summary criminal proceeding, whether the defendant was a drunkard. *See District of Columbia* v. *Clawans*, 300 U.S. 617, 624 (1937). Civil-commitment laws and surety laws provided for the adjudication of the defendant's status in a civil proceeding. *See, e.g.*, *Rahimi*, 602 U.S. at 696–97. Under § 922(g)(3), by contrast, respondent has a right to a full criminal trial in which the government bears the burden of proving to a jury, beyond a reasonable doubt, that he was a habitual user of an unlawful drug when he possessed the firearm.

In sum, the category regulated by § 922(g)(3), habitual drug users, is closely analogous to another category, habitual drunkards, that was subject to similar or more onerous restrictions at the founding. That history suffices to establish the statute's constitutionality.

*Second*, for the same reasons as discussed above, the indictment does not need to allege that Mr. Ermin was impaired on the precise date and time that he possessed the firearms. Moreover, the trial evidence will enable the jury to infer that Mr. Ermin was using, had recently used, or was a habitual user of a controlled substance on December 7, 2023, the date of his arrest for being an unlawful user of controlled substances in possession of firearms and ammunition. Accordingly, Mr. Ermin's motion to dismiss should be denied.

I.    **Mr. Ermin's Motion to Suppress the Fruits of the Search at his Residence or, Alternatively, for a *Franks* Hearing Should be Denied.**

Mr. Ermin also challenges the validity of the search warrant on his residence, arguing that the underlying affidavit contained deliberate falsehoods and requesting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  Because Mr. Ermin has failed to make a "substantial preliminary showing" that any inaccurate statement was made "knowingly and intentionally, or with reckless disregard for the truth," or that it was material to a finding of probable cause, Mr. Ermin is not entitled to a *Franks* hearing and his motion should be denied. *Franks*, 438 U.S. at 155–56.

1.    **Relevant Background**

On December 5, 2024, FBI Special Agent Thomas Weis applied for, and obtained, a search warrant targeting, in relevant part, ▆▆▆▆▆▆▆▆▆▆▆, Lancaster, New York.  *See* SW-MJ-158 at 1.  In his accompanying affidavit, Special Agent Weis explained that he had "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" into Ms. Quinn's murder and had ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *Id.* at 3 ¶ 3.  As Special Agent Weis noted, "[▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆" in his affidavit were "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆" including "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆." *Id.*

Special Agent Weis proceeded to review facts ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *See id.* at 12–28 ¶¶ 30–56. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See generally id.* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ *Id.* at 3–4 ¶ 6.

    ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████

Though Mr. Ermin does not meaningfully contest the accuracy of the overwhelming majority of Special Agent's Weis's affidavit, he does note that the affidavit inaccurately states that █████████████████████████████████████████████████████████ *See id.* at 5–6 ¶¶ 13(a)–(f). ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ *Id.*, Ex. 1 at 3 ¶ 3(c); *see also id.* at 22 ¶ 45.

    ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ As the letter outlined, the government's clarified understanding of the timeline of Mr. Gerace's comments was "███████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████."

*Id.* at 3.  Moreover, prior to Special Agent Weis ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Special Agent Weis ████████████████████████████████

██████████████████████████████████████████████████████

███████████████████.  *See* SW-MJ-158, Aff., at 30 ¶ 59 ("█████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████).

### 2.    Legal Framework

To obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing" of (1) falsity, "that a false statement ... was included by the affiant in the warrant affidavit," (2) knowledge, that the affiant made the allegedly false statement "knowingly and intentionally, or with reckless disregard for the truth," and (3) materiality, that "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56; *see United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021).

Regarding knowledge, "[a]llegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.  As for materiality element, the alleged falsehood or omission should be set aside and "the remaining portions of the affidavit should be reviewed . . . to determine if probable cause still exists." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000); *Franks*, 438 U.S. at 171–72.  If after doing so "there remains sufficient content in

the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171–72. But "if the remaining content is insufficient, the defendant is entitled . . . to [a] hearing." *Id.* at 172.

A defendant's challenge of a warrant "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* at 171. In this vein, a defendant's "allegations of deliberate falsehood or of reckless disregard for the truth" must be "accompanied by an offer of proof" with the defendant's allegations "point[ing] out specifically the portion of the warrant affidavit that is claimed to be false" and "be[ing] accompanied by a statement of supporting reasons." *Id.*

The substantial preliminary showing requirement reflects the Supreme Court's concern that permitting a hearing that impugns the veracity of statements included in a search warrant affidavit without a "sensible threshold showing" could lead to a "new large-scale commitment of judicial resources" and the "misuse of [ ] veracity hearing[s] for purposes of discovery or obstruction." *Franks*, 438 U.S. at 170. To promote this valuable policy consideration, the Second Circuit has described the "substantial preliminary showing" standard "as a heavy one" incapable of being satisfied through "a mere conclusory showing." *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023).

### 3. Application

Mr. Ermin raises three core claims in support of his motion for a *Franks* hearing. None are availing. First, he appears to imply that Special Agent Weis offered improper expert opinion testimony in his affidavit. *See* Ermin Disp. Mots., at 10 ¶ 34 ("Special Agent [ ] Weis . . . is not qualified to opine as to the Outlaw Motorcycle Club."); *id.* at ¶ 35 ("It's clear from the beginning of his affidavit that his opinions are not based on experience, but more so on consulting with others who are not identified . . ."). But Special Agent Weis never purported

to be an expert. To the contrary, Special Agent Weis explicitly informed the Magistrate Court that his opinions and beliefs were based, in part, "███████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████ SW 23-MJ-158, Aff., at 2 ¶ 3.

Second, and without citation, Mr. Ermin claims that Special Agent Weis offered historical evidence of how Outlaws MC leadership operated "[t]o enhance his lack of experience" and "superficially show probabilities." Ermin Disp. Mots., at 10–11 ¶ 37. Putting aside the fact that law enforcement affiants are supposed to establish "probabilities" in their search warrant affidavits, Mr. Ermin offers no cogent argument ███████████ ███████████████████████████████████████████████████████████ █████████████████████████████████ *See* SW 23-MJ-158, Aff., at 30 ¶ 59 (████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████). Because such evidence reasonably could contribute to the Magistrate Court's probable cause conclusion, and because Mr. Ermin fails to allege any specific inaccuracy regarding Special Agent Weis's discussion of the Outlaws leadership's historical practice, he cannot sustain his motion for a *Franks* hearing on this basis.

Third, though Mr. Ermin correctly notes ███████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████, he fails to allege any facts tending to demonstrate that Special Agent Weis deliberately or recklessly included this inaccuracy.

Existing record evidence underscores that the inaccurate timeline was the product of an innocent mistake, one initially reflected in legal filings submitted by prosecutors who, having had to litigate the issue of Mr. Gerace's detention three times in as many months, did not ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████. *See Sandalo*, 70 F. 4th at 85 (noting that "innocent mistake[s] are insufficient" to obtain a *Franks* hearing (quoting *Franks*, 438 U.S. at 171)). When that mistake did come to light, the government immediately apprised this Court of the error. *See* Exhibit C.

Lastly, Mr. Ermin contends that Special Agent Weis "inaccurately reference[d] ███████████████████████████████████████████████████████████████████ ████████████████████." Ermin Disp. Mots., at 12 ¶ 43 (quoting SW 23-MJ-158, Aff., at 3 ¶ 6). Mr. Ermin contends that this statement was false because the indictment in 19-CR-227 claimed only that "███████████████████████████████████████████████████ ███████████████████████████████████████████████████████" *Id.* (quoting SW 23-MJ-158, Ex. 2 at 2 ¶ 4). But this argument misapprehends (and misrepresents) what Special Agent Weis averred in his affidavit. Special Agent Weis ███████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████. SW 23-MJ-158, Aff., at 3 ¶ 6 (emphasis added). In other words, Special Agent Weis was referring to ████████████████████████████ ███████████████████████████████████████████████████████████████, not the 19-CR-227 Indictment's actual treatment of those individuals.

Accordingly, because he has failed to carry his "heavy burden" of demonstrating "a substantial preliminary showing" that any inaccurate statement was "knowingly or

intentionally" included in the affidavit, Mr. Ermin's motion for a *Franks* hearing should be denied.

### J.    Mr. Hinkle's Motion to Suppress the Fruits of the Search at his Residence, or Alternatively, for a *Franks* Hearing Should be Denied.

Up next, Mr. Hinkle challenges the search of his residence, 4290 Donovan Road, Alma, New York, and his property at 1614 Fanton Road, Willing, New York on October 24, 2023.  *See* Hinkle Disp. Mots., at 9–21, ECF No. 548, (dated Aug. 9, 2025) (hereinafter "Hinkle Disp. Mots.").  Because those searches were authorized by validly issued search warrants, signed by a neutral and detached magistrate, based upon a showing of probable cause, the motion should be denied.

#### 1.    Relevant Background

Mr. Hinkle argues that the evidence seized from his properties should be suppressed because of "what appears to be the misrepresentation of facts and reckless use of false statements in the applications." *See* Hinkle Disp. Mots., at 10 ¶ 10.  Additionally, Mr. Hinkle argues that evidence seized from his properties should be suppressed because of what he claims is a lack of particularity of the warrants.  *Id* at 21–25 ¶¶ 45–52.  As discussed below, because the application in support of the warrants was neither false, nor deliberately misleading, and because the warrants themselves were sufficiently particularized, Mr. Hinkle's motion to suppress physical evidence should be denied without a hearing.

#### 2.    Legal Framework

The Court should address the issue of probable cause if, and only if, a defendant satisfies the threshold standing issue.  *United States v. Pena*, 961 F.2d 333, 338 (citing *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991)).  To meet that burden, when seeking suppression of evidence seized during a search, the defendant must include a specific,

detailed, and non-conjectural affidavit based on personal knowledge of the relevant facts. *United States v. Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967) ("The affidavit submitted for appellant is insufficient in that it does not …allege personal knowledge on the part of appellant's attorney; accordingly, there was no factual issue to be resolved and the denial of a hearing was correct"). Here, Mr. Hinkle has submitted a declaration (Hinkle Disp. Mots., Ex. A), which is seemingly sufficient to establish a reasonable expectation of privacy at 4290 Donovan Road, Alma, New York and 1614 Fanton Road, Willing, New York.

When considering whether to grant an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 236, 238 (1983). "Probable cause deals with present probabilities on where evidence of criminal activity will be found." *United States v. Thomas*, 662 F. App'x 391, 398 (6th Cir. 2016) (unpublished). "In evaluating probable cause in any given case, a judge must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Raymonda*, 780 F.3d at 113 (internal quotation marks, ellipsis, and citations omitted).

A reviewing court must afford the original magistrate's determination "great deference," *Leon*, 468 U.S. at 914, and presume that the search warrant is valid, *see Franks*, 438 U.S. at 171. *See also Rivera v. United States*, 928 F.2d 592, 602–05 (2d Cir.1991). "Because the focus is on the magistrate judge's determination of probable cause, a reviewing court must

106

look to the information before the magistrate judge at the time of her decision." *United States*

*v. Conley*, 342 F. Supp. 3d 247, 271 (D. Conn. 2018).

> As the Second Circuit has observed:

> > [c]ourts have repeatedly been warned not to interpret[ ] the affidavit in
> > a hypertechnical, rather than a commonsense, manner.  We are also
> > mindful that affidavits are normally drafted by nonlawyers in the midst
> > and haste of a criminal investigation.

*United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000) (internal quotations and citations
omitted).

"A defendant is permitted to challenge the veracity of a search warrant in limited

circumstances." *Id*. at 717.  The Fourth Amendment entitles a defendant to a hearing if he or

she makes a "substantial preliminary showing" that a deliberate falsehood or statement made

with reckless disregard for the truth was included in the warrant affidavit and the statement

was necessary to the Judge's finding of probable cause.  *Franks*, 438 U.S. at 155–56.  The

standard for entitlement to a *Franks* hearing is high, *see Rivera*, 928 F.2d at 604, "[t]o invoke

the *Franks* rule, a defendant is required to show: (1) 'that there were intentional and material

misrepresentations or omissions' in the warrant affidavit, and (2) that the 'alleged falsehoods

or omissions were necessary to the . . . probable cause finding,'" *United States v. Mandell*, 752

F.3d 544, 552 (2d Cir. 2014) (quoting *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir.

2003)).  "[T]he defendant cannot rely on a purely subjective disagreement with how the

affidavit characterizes the facts.  Rather, there must be evidence showing that the statements

at issue are objectively false." *United States v. Moody*, 931 F.3d 366, 370–71 (4th Cir. 2019).

A showing of falsity "'must be more than conclusory' and should include affidavits or other

evidence to overcome the 'presumption of [the warrant's] validity.'" *United States v. Clenney*,

631 F.3d 658, 663 (4th Cir. 2011) (quoting *Franks*, 438 U.S. at 171).  Moreover, affidavits or

sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. *Franks*, 438 U.S. at 171.

3.    **Application**

a.    **The Affidavit established probable cause**

The search warrant was supported by substantial, detailed, and current information contained in the application and affidavit of FBI Special Agent Adam Penna, which included

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████    For instance, █████████████████████████

█████████████████████████████████████████.    *See* **Exhibit D**,

Affidavit at ¶ 5(a). [29] ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

*Id.*

       ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████    ████████████████████████████

---

[29]    The government is providing the Court with a "clean copy" of the search warrant, application, affidavit (the very minimally redacted version provided to the defendant), and attachments, attached hereto as **EXHIBIT D**.



---

³⁰       The "Target Offenses" for this search warrant and application, as set forth in ¶ 8 of the affidavit, include "violations of Title 18, United States Code, Sections 1513(a)(1) and (f) (retaliation against a witness, victim, or informant and conspiracy to do the same); Title 18, United States Code, Sections 1512(b) and 1512(k) (witness tampering and conspiracy to do the same); Title 18, United States Code, Section 1001(a) (false statements); Title 18, United States Code, Section 2 (aiding and abetting); and Title 18, United States Code, Section 4 (misprision of a felony)."



Mr. Hinkle has been provided with a very slightly redacted version which is attached to his motion as Hinkle Disp. Mot., Exhibit B.

**b.  The search warrant was sufficiently particularized and the subsequent plain-view observations of drugs and firearms from Mr. Hinkle's residence did not undercut that particularity.**

Mr. Hinkle next contends that "the search warrants themselves do not seek, request, set forth, list or address weapons, firearms, drugs and/or marijuana to be searched and seized or that it will be found at either premises."  *See* Hinkle Disp. Mots. at ¶ 45.  He then claims that, because drugs and firearms were ultimately seized from his residence, the search warrants themselves lacked particularity.  *Id.* at ¶ 48.

In support of his motion, Mr. Hinkle cites to *United States v. Groh*, 540 U.S. 551, 558 – 559 (2004), a case in which the warrant did not describe the items to be seized at all.  *See* Hinkle Disp. Mot. at ¶ 47.  As the defendant must know, that is not the case here.  The Attachment B of the search warrants at issue here have a literal "A through Z" itemization of things to be searched for and seized, listing a total of twenty-six categories of items to be searched for and seized and tying those things to specifically enumerated federal offenses.

Relatedly, Mr. Hinkle argues that the seizure of firearms and marijuana from his properties amounted to a warrantless seizure because those items were not listed on the Attachment B of the search warrants.    *See* Hinkle Disp. Mots.at ¶ 48.    Without any explanation or evidentiary support whatsoever, Mr. Hinkle asserts that "the warrant was a disguise to get into the premises in an effort to search for weapons and drugs absent probable cause for those offenses."    *Id.* at ¶ 49.    This claim is in direct conflict with the 70-page search warrant affidavit making it clear exactly what agents were investigating and exactly what types of evidence they were looking for.

The plain view doctrine allows the warrantless seizure of objects whose incriminating character is obvious during a lawful search.    *Coolidge v. New Hampshire*, 403 U.S. 443 (1971). "If police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."    *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).    To justify a plain view seizure, "[n]ear certainty of the article's criminal character is not necessary."    *United States v. Barrios-Moriera*, 872 F.2d 12, 17 (2d. Cir. 1989).    The incriminating character of a firearm can be immediately apparent to law enforcement when viewed in the context of a defendant's prior felony conviction.    *See e.g., United States v. Jarvis*, 237 Fed. Appx. 636, 639 (2d Cir. 2007).

While agents were present at Mr. Hinkle's properties, they observed items in plain view that were obviously and apparently contraband, including narcotics and firearms, the latter of which were plainly criminal because law enforcement knew that Mr. Hinkle was a felon.    As such, the warrantless seizure of those items would have conformed to the plain view doctrine.    However, in an abundance of caution, and taking a "belt-and-suspenders"

approach, the government applied for and obtained a so-called follow up warrant.  Before the

firearms and drug evidence were seized from ██████████████, the FBI applied before

Magistrate Judge Roemer for an additional search warrant (23-mj-5218)[31] authorizing them

to search for and seize a variety of items, based upon their plain-view observations, including

firearms, ammunition, and controlled substances.

████████████████████

    While present at ████████████, Wellsville NY to execute a search warrant, law

enforcement agents observed and seized the numerous firearms and items of drug-evidence

as documented in the FBI reports and photographs memorializing the evidence seized from

████████████.[32]  The firearm and drug evidence seized from that location, as well as

the location where it was seized from, are summarized in the table below:

| ITEM NUMBER | ITEM DESCRIPTION | LOCATION SEIZED |
|---|---|---|
| 1A | Savage Arms .22 Cal Rifle | Room A - Behind Front Door |
| 1B | Magazine loaded with .22 Cal Ammunition | Room A - Behind Front Door |
| 2 | Remington .243 Cal Rifle | Room A - Corner / Behind Front Door |
| 3 | Knight Muzzleloader with scope | Room A - Corner |
| 5A | Ruger .22 Cal Rifle | Room B - Corner |
| 5B | Live Round of .22 Cal Ammunition | Room B - Corner |
| 6 | Remington .50 Cal Rifle with scope | Room F - Behind Door |
| 7A | Primers and lead round balls for muzzleloading | Room A - On hook |

---

[31]    Produced to Court and Counsel as **EXHIBIT E**, a PDF containing the follow-up search warrant for ██████d (and curtilage) and the Jay Feather Trailer (23-mj-5218), authorizing agents to search for and seize, *inter alia*, firearms, ammunition, and controlled substances.  The follow-up search warrant was produced in the May 2024 discovery production at bates-number GOV-00013743.  Upon request, the affidavit in support of the follow-up search warrant was recently produced to defense counsel as well.

[32]    Produced to Court and Counsel as **EXHIBIT F**, FBI Evidence Collected Item Log (discovery bates-number GOV00013255), FBI Photo Log (discovery bates-number GOV00013242), and PDF containing photographs from search warrant execution (discovery bates-number GOV00013278 through GOV00013685).

| 7B | Four containers of gunpowder | Room A - On hook |
|---|---|---|
| 7C | Ammunition components | Room A - On hook |
| 8A | Remington .22 Cal Rifle | Room F - Next to Hutch |
| 8B | 11 rounds of .22 L/R ammunition | Room F - Next to Hutch |
| 9 | 20-Gauge Shotgun | Room F - Next to Hutch |
| 10A | 457 assorted rounds of live ammunition and two magazines | Room G - On shelf on stairs |
| 10B | 8 shell casings (fired) | Room G - On shelf on stairs |
| 10C | 91 lead round balls for muzzleloading | Room G - On shelf on stairs |
| 14A | 36 rounds of live ammunition | Room G - On shelf on stairs |
| 14B | 5 lead round balls for muzzleloading | Room G - On shelf on stairs |
| 15 | 339 rounds of live ammunition | Room G - On shelf on stairs |
| 16 | 60 rounds of 12-gauge ammunition | Room G - On shelf on stairs |
| 17 | 23 rounds of live ammunition and loaded Ruger Magazine with .22 Cal ammunition | Room B - On table next to fridge |
| 19 | J Stevens Arms Shotgun | Room I - Attic Floor |
| 20 | Ithica Gun Co. Rifle with Scope | Room I - On Floor |
| 21 | Remington Arms 12-gauge shotgun | Room I - On Floor |
| 22 | Loaded Ruger Magazine with .22 Cal ammunition and 1 round of .243 ammunition | Room B - In bin on table |
| 23 | Crescent Firearms Model: Peerless | Room F - In closet |
| 24A | 4 Glass containers of Green Leafy Substance | Room F - In closet |
| 24B | Scale with residue | Room F - In closet |
| 25 | Jar of Green Leafy Substance | Room D - In closet |
| 26 | Remington Arms Shotgun | Room D - In closet |
| 27 | 24 rounds of live ammunition | Room D - In closet |
| 28 | 2 rounds of live ammunition | Room D - On desk |
| 29 | CVA Olympia Rifle | Room D - In corner |
| 30 | New England Firearms Rifle | Room D - In corner |
| 31 | Scale with residue | Room D - On floor |

| 32 | Mossberg Shotgun | Room D - In closet |
|---|---|---|
| 33 | Bin containing Jars of Green Leafy Substance | Room D - Under Window |
| 34 | 12 gauge rounds of live ammunition | Room D – In closet in vest |
| 35 | 13 rounds of live ammunition | Room G - On shelf on stairs |
| 36 | 70 rounds of live ammunition | Room G - On shelf on stairs |
| 37 | Bags of green leafy substance | Room H - Corner of basement |
| 38 | Bin of green leafy substance | Room H - On floor |
| 39 | 33 rounds of live ammunition | Room H - On shelf |
| 40 | Bags of green leafy substance | Room H - On shelf |
| 41 | Scale with residue | Room D - In desk |
| 42 | Scale with unknown residue | Room D - In desk |
| 43 | Green leafy substance | Room F - Under hutch |
| 44 | Green leafy substance | Room H - In grow hut |
| 45 | Remington Arms shotgun | Room F - Under bed |
| 46 | Laser | Room D - On desk |
| 47 | Spa Luige Shotgun | Room F - Under bed |
| 48 | 5 jars of Green Leafy Substance | Room D - Under desk |
| 49 | Unknown revolver | Room G - On shelf on stairs |
| 51 | 184 rounds of live ammunition | Room G - On shelf on stairs |
| 52 | Green Leafy Substance/Plants | Backyard |
| 53 | Remington Arms Shotgun | Room F - Under bed |
| 54 | Four 16-gauge rounds of ammunition and a box of 12-gauge ammunition | Room D - On window ledge |
| 55 | 2 boxes of 12-gauge ammunition | Room G - On shelf on stairs |
| 56 | Bag of Green Leafy Substance | Room J - In toolbox |
| 57 | Green Leafy Substance/Plants | Backyard |
| 58A | Green Leafy Substance/Plants | Backyard |
| 58B | Green Leafy Substance/Plants | Backyard |
| 58C | Green Leafy Substance/Plants | Backyard |
| 58D | Green Leafy Substance/Plants | Backyard |

| 60 | Green Leafy Substance/Plants | Backyard |
| 61 | Green Leafy Substance/Plants | Backyard |
| 62 | Green Leafy Substance/Plants | Backyard |
| 64 | Laser | Room B - In Bin on table |
| 65 | Jar of Green Leafy Substance | Room B - On kitchen table |
| 66 | 2 rounds of .223 caliber ammunition | Room F - On hutch in jewelry box |
| 67 | Silver pen with needle with unknown residue | Room D - On desk |
| 68 | 30-30 round of ammunition | Room D - On top of desk |
| 76 | Unknown brown powdery substance in plastic containers (susp. Marijuana) | Room D - On desk |
| 77 | Unknown bag of white powder | Room H - Behind stairs |
| 78 | Black magazine | Room H - Behind stairs |

As described in the chart above, substantiated by the attached **EXHIBIT F**, each of the seized items consisting of drug or firearm/ammunition evidence was observed by the FBI in plain view while they were lawfully searching the premises at ███████████ for items described in Attachment B of the search warrant. Because the warrant authorized agents to search for small items such as cell phones and electronic storage media, virtually any area or closed container within the premises at ███████████ was an area where agents were properly authorized to search. The firearms and drugs were observed in plain view during the execution of the search warrant and their incriminating nature was immediately apparent. The same is true for the marijuana plants scattered in pots across the yard. Special Agent Penna explained in his affidavit that law enforcement was aware that Mr. Hinkle was a previously convicted felon. *See* EXHIBIT D, Affidavit at ¶ 87. As this Court can observe for itself from the photographs taken during the execution of the search warrant, the firearms, ammunition, and drugs described in the chart above were each

observed by law enforcement in plain view and could have been properly seized as contraband in plain view pursuant to the execution of the original warrant (23-mj-5213), and were certainly properly seized pursuant to the follow-up search warrant (23-mj-5218).

In his motion, Mr. Hinkle asserts that the seizure of drugs and firearms from ████ █████████ exceeded the scope of search warrant 23-mj-5213.  While the government maintains that those items would have been properly seized as contraband in plain view, such a determination is not necessary here.  The government took the additional prophylactic step of applying for a follow-up warrant, obtaining the authorization of a neutral and detached magistrate to seize the drugs and firearms from defendant Hinkle's property at ███████████ ████.

### Jay Feather RV parked on curtilage of ███████████████ Search

While present at ████████████, Wellsville NY to execute a search warrant, law enforcement agents searched a "Jay Feather RV" parked in the curtilage to the premises and observed and seized the items of drug-evidence as documented in the FBI 302 reports memorializing the evidence seized from "Subject RV 1" at ██████████████.[33]  The drug evidence seized from that location included two items (1A and 1B) described as a Green Leafy Substance.  As depicted in the photographs (EXHIBIT G), the marijuana was in plain view inside of the RV, hanging from the ceiling and strewn across drying racks and on the floor.

Mr. Hinkle objects to the "warrantless search" of his trailer/camper located on the property at ████████████ and seeks to suppress the evidence seized from within that trailer/camper.  *See* Hinkle Disp. Mots., at ¶¶ 51–52.  Mr. Hinkle contends that law

---

[33]    Produced to Court and Counsel as **EXHIBIT G**, FBI 302 report documenting the search of the Jay Feather RV (bates-number GOV00013748) and PDF containing photographs from search warrant execution (bates-range GOV00013754 through GOV00013783).

enforcement agents could have, and should have, applied for a separate subsequent warrant authorizing them to search that trailer/camper.  *Id.*  In fact, the government did just that, applying for and obtaining the follow-up search warrant (23-mj-5218) authorizing the government to search the trailer and seize drug evidence from inside.

This court should deny Mr. Hinkle's motion because the Jay Feather RV was parked on the curtilage of ████████████ and was therefore authorized to be searched pursuant to the initial warrant (23-mj-5213).  Attachment A-2 of Search Warrant 23-mj-5213 describes the property to be searched as "████████████, Alma, NY 14895 **and curtilage** is a three-bedroom single family dwelling.  Photos of the SUBJECT PREMISES 2 from various angles are set forth below as follows:"  *See* Hinkle Disp. Mots., Ex. C.  Attachment A-2 then includes a total of eight (8) separate photographs depicting the house at ████████████ as well as the items on the curtilage, to include the "Jay Feather RV" parked in the driveway next to the house.  *Id.*

The Supreme Court defines curtilage as "an area around the home to which the activity of home life extends" and thus, extends the same heightened Fourth Amendment protections to the curtilage as to the home.  *See Oliver v. United States*, 466 U.S. 170, 180 (1984).  In *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court listed four factors for a court to determine if an area qualifies as curtilage: (1) how close the area is to the home; (2) whether the area is enclosed; (3) how the area is used; and (4) how, if at all, the area is protected from viewing by outsiders.  The Second Circuit has also considered additional factors, including (5) "whether society would recognize the particular area claimed as within the curtilage of the home;" and (6) "whether the defendant has manifested a subjective expectation of privacy."  *United States v. Titemore*, 437 F.3d 251, 258 (2d Cir. 2006).

In *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996), the Second Circuit held that the curtilage of a defendant's home included a cottage that was located 375 feet from the main residence, where the cottage and the main residence were located on 10.71-acre tract of land, property was enclosed by wire fence, hedgerows, and thick woods, there was no interior fencing separating cottage from main residence, defendant and his guests used cottage area for a variety of private activities, including fishing, naked swimming, croquet, cooking, and sexual intercourse, and park-like appearance of the area made it readily apparent to observes that the area was private.

The search warrant for ███████████ expressly permitted agents to search the curtilage of the home. There should be no doubt as to what both the agent and the magistrate court understood "and curtilage" to mean in the context of the Attachment A-2. The eight photographs included in the Attachment A-2 depict multiple trucks, two outbuildings, a boat, and the RV, all on the property surrounding the house at ███████████. Here, defendant takes the position that his Jay Feather RV, parked right next to his house on a driveway, is not part of the curtilage of his home because it is not "attached to the residence, surrounded by a fence, [or] intimately tied to the house."

That same argument was rejected in *United States v. Sykes*, No. 05-CR-6057, 2006 WL 2711460 (W.D.N.Y. Sept. 20, 2006), where the district court concluded that law enforcement's search of two automobiles, one parked in the driveway and the other parked in the backyard of a particular, multi-unit residence, was within the scope of a search warrant that authorized the search of the residence to include "all its storage areas and curtilage." *Id.* at *3 (citing *United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990) (warrant for

119

premises "generally includes any vehicles located within its [curtilage]"); *United States v. Pecival*, 756 F.2d 600, 612 (7th Cir. 1985) ("search warrant authorizing a search of a particularly described premises may permit the search of vehicles owned or controlled by the owner of, and found on, the premises"); *United States v. Bulgatz*, 693 F.2d 728, 739 n.3 (8th Cir. 1982) (warrant for house authorized search of car parked in attached garage); *United States v. Freeman*, 685 F.2d 942, 955 (5th Cir. 1982) (search warrant for residence justified search of vehicle located on premises); *United States v. Napoli*, 530 F.2d 1198, 1200 (5th Cir. 1976) (search warrant for residence authorized search of camper parked in driveway)).[34]

Here, there is no dispute that the search warrant was for a private, single-family premises, specifically authorized agents to search the curtilage, and depicted a photograph of the Jay Feather RV parked next to the residence. The photographs from the execution of the search warrant depict the Jay Feather RV parked in the gravel driveway within feet of the side of the residence at ███████████, with steps leading from the side of the residence directly up to the rear of the Jay Feather RV (*see* **EXHIBIT G**, bates-number GOV-00013779).

### ███████████████ Search

While present at ███████████ to execute a search warrant, law enforcement agents observed and seized the numerous firearms and items of drug-evidence as documented

---

[34]    On appeal, a panel of the Second Circuit did not reach the propriety of the search of the defendant's vehicle. *See United States v. Sykes*, 304 F. App'x. 10, 12–13 (2d Cir. 2008) (unpublished). However, in a footnote, the panel indicated that, if it were to reach that issue, it would have remanded the matter back to the district court for further fact-finding to determine if the defendant had "a reasonable expectation of privacy in the backyard area where the vehicle was located that would bring it within the scope of the curtilage of his apartment." *Id.* at 12 n.1.

in the FBI 302 reports memorializing the evidence seized from 1614 Fanton Road.[35]   The

firearm and drug evidence seized from that location, as well as the location where it was

seized from, are summarized in the table below:

| ITEM NUMBER | ITEM DESCRIPTION | LOCATION SEIZED |
|---|---|---|
| 2 | Green Leafy Substance | Room B – Kitchen Counter |
| 3 | Green Leafy Substance | Room B – Kitchen Counter |
| 4 | Green Leafy Substance | Room C – Folger Can on Floor |
| 5 | Green Leafy Substance | Room C – In Backpack on Floor |
| 8A | 12-gauge shotgun shell | Room C – Gun Rack |
| 8B | Nine 20-gauge shotgun shells | Room C – Gun Rack |
| 8C | Six .223 caliber cartridges ammunition | Room C – Gun Rack |
| 8D | Six .243 caliber cartridges ammunition | Room C – Gun Rack |
| 8E | 43 cartridges of .22 WMR ammunition | Room C – Gun Rack |
| 10A | Six 12-gauge shotgun shells | Room C – On Table |
| 10B | Three 16-gauge shotgun shells | Room C – On Table |
| 10C | Two 20-gauge shotgun shells | Room C – On Table |
| 10D | Three .270 caliber cartridges ammunition | Room C – On Table |
| 12 | 16-gauge shotgun shells | Room C – Gun Case |
| 13A | Three 16-gauge shotgun shells | Room C – Gun Case |
| 13B | Six 12-gauge shotgun shells | Room C – Gun Case |
| 15 | Forehand Hopkins Long Gun | Room C – On Rafter |
| 16 | 36 "short cartridge" ammunition | Room B – Jar on Kitchen Table |
| 9A through 9S (inclusive) | Various rounds of different ammunition | Room C – On Bookcase |
| 10E | Three .22 caliber ammunition | Room C – On Table |

---

[35]    Produced to Court and Counsel as **EXHIBIT H**, FBI Collected Evidence Log (bates-number GOV00012853), FBI Photo Log (bates number GOV00012822), and PDF containing photographs from search warrant execution (bates-range GOV00012867 through GOV00013144).

As described in the chart above, substantiated by the attached EXHIBIT H, each of the seized items consisting of drug or firearm/ammunition evidence was observed by the FBI in plain view while they were lawfully searching the premises at ███████████ for items described in Attachment B of the search warrant. Because the warrant authorized agents to search for small items such as cell phones and electronic storage media, virtually any area or closed container within the premises at ████████████ was an area where agents were properly authorized to search. The firearms and drugs were observed in plain view during the execution of the search warrant and their incriminating nature was immediately apparent. ████████████████████████████████████████ ████████████████████. *See* EXHIBIT D, Affidavit at ¶ 87. As this Court can observe for itself from the photographs taken during the execution of the search warrant, the firearms, ammunition, and drugs described in the chart above were each observed by law enforcement in plain view and were properly seized.

### c. Law enforcement acted with good faith reliance on the search warrants.

However, even if Judge Roemer lacked a substantial basis for concluding that probable cause existed for the search warrants, which the government disputes, the evidence should not be suppressed because the officers relied in good faith upon a search warrant issued by a neutral and detached magistrate judge. *See Leon*, 468 U.S. at 926 (observing "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause"); *see also United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (holding that because the officers who executed the search warrants acted in good faith, there was no need to suppress evidence

thus discovered, even if the search warrant neglected to describe the items to be seized with particularity or even if the warrant was stale when issued).

### d.    The affidavit was not knowingly false or deliberately misleading

Mr. Hinkle also moves for a *Franks* hearing.  His claim that the search warrant affidavit was in any way misleading, let along deliberately misleading, is not supported by the evidence.

Mr. Hinkle's first argument in support of his motion for a *Franks* hearing is that Special Agent Penna lacks the qualifications to opine on "factors surrounding the overdose drug death of Crystal Quinn or the nature of this specific case."  Hinkle Disp. Mot. at ¶¶ 15–16.  As this argument has seemingly nothing to do with whether the affidavit submitted by Special Agent Penna was false or deliberately misleading, it does nothing to move the needle on the Mr. Hinkle burden of making a "substantial preliminary showing" entitling him to a hearing. However, in response to Mr. Hinkle's claims that Special Agent Penna lacks qualifications to opine on "the nature of this specific case", the government would point the Court to ¶ 2 of the search warrant affidavit. ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████[36]██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████" EXHIBIT D, Affidavit at ¶ 2. ███████████████

---

[36]    The "Target Offenses" listed in the search warrant application, as listed in FN1 *supra*, include witness tampering and retaliation, the same offenses that Special Agent Penna reports having experience investigating.  The target offenses also include violations of Title 18, United States Code, Section 1001, a statute which any FBI Special Agent handling public corruption cases is sure to be quite familiar with.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████ All those qualifications fall squarely within the type of investigation that Special Agent Penna was conducting in the instant case at the time he submitted the search warrant application. Special Agent Penna's affidavit established his experience and qualifications investigating the very offenses listed in the search warrant application, and Mr. Hinkle's complaint that Special Agent Penna was not previously a homicide detective do nothing to detract from those experiences and qualifications.

Mr. Hinkle next argues that Special Agent Penna "misrepresent[ed] to the Magistrate Judge that Mr. Hinkle is a member or associate of the Rare Breed Motorcycle Club." Hinkle Disp. Mot. at ¶ 17. According to America's Most Trusted Dictionary, Merriam-Webster, the word "associate" when used as a noun, is defined as "one associated with another: such as partner, colleague, companion, comrade."[37] Giving the word used by Special Agent Penna in his affidavit its plain meaning, Mr. Hinkle was undoubtedly an "associate" of members of the Rare Breed Motorcycle Club. Special Agent Penna explained ████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ EXHIBIT D, Affidavit at ¶ 79. Notably, Mr. Hinkle, while claiming that Special Agent Penna misrepresented Mr. Hinkle's status as an associate of the RBMC, does not cite to ¶ 79 of Special Agent Penna's affidavit. Mr. Hinkle claims that Special Agent Penna withheld information from the Magistrate Court about an interview with ███████████ which "confirmed Mr. Hinkle was

---

[37] See https://www.merriam-webster.com/dictionary/associate , last visited August 29, 2025.

not a member of RBMC." Hinkle Disp. Mot. at ¶ 19.  What Mr. Hinkle neglects to mention is that the ████████████████████████ occurred <u>after</u> Special Agent Penna applied for and executed the instant search warrant.

On this same topic, Mr. Hinkle complains to the Court that Special Agent Penna "holds back evidence confirming [that he] is not a member/associate [of RBMC]."  Hinkle Disp. Mot.at ¶ 21.  Mr. Hinkle argues to the Court that Special Agent Penna "never advises or puts forth in his application the full content of Mr. Gogolack's interview exculpating Mr. Hinkle or confirming the fact that he is not a member or associate of RBMC."  *Id.* at ¶ 20. This claim must fail because—as Mr. Hinkle himself later acknowledges[38]—█████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ *See* EXHIBIT D, Affidavit at ¶ 79.

Defendant Hinkle spills considerable ink in his *Franks* motion arguing that Special Agent Penna intentionally misled and misrepresented to the Magistrate Court that Mr. Hinkle was a member or associate of the RBMC, referring to it as the "deliberate misrepresentation of Mr. Hinkle's membership in the RBMC" to "inflame the Magistrate Court toward Mr. Hinkle . . ." Hinkle Disp. Mot. at ¶ 35.  Mr. Hinkle represents to this Court, through counsel, that "Mr. Hinkle is not, and never was, a member/associate of RBMC or any other motorcycle club."  *Id.*

---

[38] ████████████████████████████████████████████████████ ████████████████████████████████████████████████



It is one thing to allege that a search warrant affidavit lacks sufficient evidence to establish

probable cause, and quite another to allege—on this record—that a federal agent made intentionally false or misleading sworn statements.

Next, defendant Hinkle alleges, baselessly, that Special Agent Penna "misrepresented to the Magistrate Judge what was actually said about "money on her head". Hinkle Disp. Mots., at ¶¶ 22–28. Mr. Hinkle cites to ¶ 5(c) of the search warrant affidavit which states, in pertinent part, that " █████████████████████████████████████ ████████ " Mr. Hinkle alleges through counsel in his motion (although not in an affidavit by someone with personal knowledge) that "Mr. Hinkle never told Crystal Quinn there was 'money on her head'". Hinkle Disp. Mots., at ¶ 24. Mr. Hinkle states that Special Agent Penna "misrepresents to the Magistrate Judge that Mr. Hinkle said there was '███████████ ████ ', but he also makes it look like Mr. Hinkle said this to Crystal Quinn when in fact S.A. Penna knew he never did." *Id.* at ¶ 27. The government points out for the Court that ¶ 5 literally starts with the disclaimer that "█████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ :". **EXHIBIT D**, Affidavit at ¶ 5 (emphasis added).

From there, Mr. Hinkle clarifies that his gripe is that Special Agent Penna did not include the ████████████████████████████████████████████ ███████████████████████████████████████████ *Id.* In reality, ██████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████████.”  **EXHIBIT D**, Affidavit at ¶ 80 (emphasis added).  In fact, in

¶ 80, Special Agent Penna provided context to the Court regarding ████████████

████████████████████████████ Additionally, ████████████

████████████████████████████████████████ *Id.*

Special Agent Penna's statement in ¶ 80 of the search warrant affidavit is in no way false or

misleading.

 Mr. Hinkle also alleges that Special Agent Penna "wrongfully uses the terms ███ or

████ on Ms. Quinn.  ████████ never uses those terms."  Hinkle Disp. Mot. at ¶ 34.

Again, the defendant's allegation that Special Agent Penna was in any way misleading or

untruthful falls flat on its face.  In fact, Special Agent Penna wrote "████████

████████████████████████████████████████

████████████████████████████████

███████████████████████ **EXHIBIT D**, Affidavit at ¶ 80 (emphasis added).

Mr. Hinkle neglected to mention in his motion to this Court that Special Agent Penna literally

started that sentence with the phrase "████████", clearly signaling for the Court that he

was providing an opinion/interpretation of what Gogolack said, and not directly quoting

from Gogolack.  Once again, Mr. Hinkle is the one being misleading to the Court, not Special

Agent Penna.

 Mr. Hinkle further claims that Special Agent Penna misrepresented the facts to the

magistrate court regarding whether Frank Knight deliberately withheld information about

who had attended the Thursday poker game several days before Quinns' death.  Hinkle Disp.

Mot. at ¶ 29.  Specifically, Mr. Hinkle claims that Special Agent Penna misrepresented that

Frank Knight was not forthcoming with information about who attended the poker game

because "Knight advised that he kept a list but had deleted it" and claiming that this proves Knight did "readily offer up this information."  Hinkle Disp. Mots., at ¶ 29.  But Mr. Hinkle's suggestion that Special Agent Penna deliberately misled the magistrate court reflects either an intentional misreading of Special Agent Penna's affidavit or a failure to comprehend it.  In fact, a full reading of █████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████

      Mr. Hinkle also asserts that Special Agent Penna "misrepresents to the court" that Mr. Knight provided false statements during an interview about whether Mr. Hinkle attended the July 27, 2023, poker game because, as Mr. Hinkle notes, Mr. Knight "corrected himself" after making his false statement.  Hinkle Disp. Mot. at ¶ 33.  Once again, a review of the affidavit makes clear that Special Agent Penna did not misrepresent or mislead in any way.  To the contrary, Special Agent Penna advised the magistrate court that

████████████████████████████████████████████████████



**EXHIBIT D**, Affidavit at ¶ 68.

Thus, far from misrepresenting anything, 

" *Id.* Special Agent Penna laid out the facts for the magistrate court without misleading

or misrepresenting in any way. It is worth noting that a Federal Grand Jury ultimately

indicted Knight for a violation of Title 21, United States Code, Section 1001. *See* Sec. Super.

Indict., at 35 (Count 5).


Mr. Hinkle's next shots at Special Agent Penna's affidavit also miss the mark.

Specifically, Mr. Hinkle targets Special Agent Penna's statements in ¶ 87 of the search warrant

affidavit, arguing that they, too, are misrepresentations.

This is apparent during a review of the interview. Mr. Gogolack attempts to direct

the statements away from Mr. Hinkle's comments towards Quinn and, instead, focuses on

"she's just eating Adderall and fucking just freaking out. She's like, pretty loose, you know,

and like, she's like, she's, you know like not thinking clear."  Mr. Gogolack further stated,
"Howie has nothing to do with this stuff.  She thinks that possibly that, uhm, that they spoke
with some other leader that they know they're there.  Nobody knows that she's even Crystal
from Depew New York," and proceeds to tell that "Howie's a waste of time, man" again
attempting to redirect agents away from defendant Hinkle.  *See* Hinkle Disp. Mot., Ex. E.

███████████████████████████████████████████████████

Next, Mr. Hinkle claims that Special Agent Penna misrepresented to the magistrate
court that agents believed Mr. Hinkle was present for the altercation at Mr. Gogolack's
residence in the early morning hours of July 28, 2023, based in part on what was reported in
FBI CAST analysis.  *See* Hinkle Disp. Mot. at ¶ 38.  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████   ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████"  **EXHIBIT D**, Affidavit at ¶ 150.  Special Agent Penna
accurately represented to the magistrate that "████████████████████████████████████

██████████████████████████████████████████████████   ██████████

████████████████████████████████████████████████████

████████████████████████   **EXHIBIT D**, Affidavit at ¶ 153.  Special Agent Penna in
no way misrepresented cell site data or CAST data to suggest that Mr. Hinkle was present at

Mr. Gogolack's house during the July 28, 2023, altercation.  Instead, ███████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

        To rebut this straightforward interpretation of Special Agent Penna's affidavit, Mr.

Hinkle argues, incorrectly, that the absence of activity on his phone between certain hours,

and/or the fact that his phone did not appear in the Google geofence return somehow

affirmatively proves that Mr. Hinkle himself was not present in the vicinity of Mr. Gogolack's

residence in the early morning hours of July 28, 2023.  *See* Hinkle Disp. Mot. at ¶ 38.  Mr.

Hinkle then uses that fallacious premise to argue that Special Agent Penna misled the

Magistrate Court.  To the contrary, Special Agent Penna advised ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████        *See* **EXHIBIT D**, Affidavit at ¶ 153.  Mr. Hinkle also

argues that Special Agent Penna misled the court because the CAST analysis of Mr. Hinkle's

historical cell site records from July 28, 2023 "shows Mr. Hinkle's phone not to be active from

12:09 AM – 10:59 AM on July 28, 2023".  *See* Hinkle Disp. Mot. at ¶ 38.  Mr. Hinkle further

claims that "SA Penna had all of this information and was fully aware of the inactivity of Mr.

Hinkle's phone and no documentation of his presence at Gogolack's residence when he

[makes] misrepresent[ation]s to the Court . . ." regarding his presence at defendant Gogolack's

residence during the early morning hours of July 28, 2023.

        Once more, this argument is based on a factually inaccurate premise.  Special Agent

Penna did *not* "ha[ve] all of this information" at the time he applied for the instant search

warrant on October 22, 2023.  In reality, and as Mr. Hinkle well knows, Verizon did not

produce historical cell site data for Mr. Hinkle's phone until November 12, 2023, over three

weeks *after* Special Agent Penna submitted the instant search warrant affidavit to Magistrate Judge Roemer.  *See* **EXHIBIT L**, Certification of Authenticity from Verizon regarding production of Hinkle's historical cell site records.  At best, Mr. Hinkle made this argument to the Court (alleging that Special Agent Penna intentionally withheld information from the magistrate court) without first checking the records to see if what he was alleging was accurate.

Next, Mr. Hinkle contends that Special Agent Penna "attempts to create the appearance to the Court that ███████████ texted Gogolack threatening to send the police to his house for ██████████."  *See* Hinkle Disp. Mot. at ¶ 39.  This argument is belied by the affidavit itself.  In the affidavit, Special Agent Penna ████████████████████ ██████████████████████████████████████████.  *See* **EXHIBIT D**, Affidavit at ¶ 127.    Mr. Hinkle's contention that Special Agent Penna somehow misrepresented the "intent" of the text message to the magistrate court is not supported by a plain reading of the text messages.

Mr. Hinkle also takes issue with Special Agent Penna's stated opinions related to Crystal Quinn's death.  Hinkle Disp. Mot. at ¶¶ 39–41.  Mr. Hinkle argues that Special Agent Penna is unqualified to offer such opinions.  *Id.* at ¶ 40.  However, he makes no showing that what Special Agent Penna alleged in the affidavit was either knowingly false or intentionally misleading.  The magistrate court was aware of Special Agent Penna's qualifications, having read about them earlier in the affidavit.  Mr. Hinkle also claims that Special Agent Penna made a misrepresentation to the court when Special Agent Penna stated that "█████████ ████████████████████████████████████████████████████████████ ████████"  *Id.* at ¶ 40.  Mr. Hinkle's gloss on Special Agent Penna's statements hardly reflects

the statements themselves.  In reality, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████.  *See* **EXHIBIT D**, Affidavit at ¶¶ 139–44.  Special Agent Penna articulated

for the magistrate judge the specific facts that supported his belief.  *Id.*  The defendant's

disagreement with Special Agent Penna's statement of belief (based upon his training and

experience, and involvement in the investigation, as well as his coordination with other

experienced agents) does not amount to evidence that Special Agent Penna made false

statements or misrepresentations in the affidavit.

Next, Mr. Hinkle asks this Court to play semantic games about the definition of "close

relationship", as used by Special Agent Penna to describe Mr. Gogolack and Mr. Hinkle.

What is important, as conceded by Mr. Hinkle, is that Special Agent Penna articulated

specific facts—none of which the defendant contests as false or misleading—to support his

statement that Mr. Gogolack and Mr. Hinkle have a "close relationship".  Special Agent

Penna provided the magistrate court ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.  This Court should not find that Mr. Hinkle's

disagreement with the classification "close friends" amounts to anything materially

misrepresented or false.

Accordingly, because he has failed to carry his "heavy burden" of demonstrating "a

substantial preliminary showing" that any inaccurate statement was "knowingly or

intentionally" included in the affidavit, defendant Hinkle's motion for a *Franks* hearing should

be denied.

### K.    Mr. Hinkle's Motion to Suppress Statements Should be Denied.

Mr. Hinkle moves to suppress statements he made to HSI Special Agents on October 24, 2023, after he was removed from his residence and before he arrived at the Wellsville Police Department, arguing that the defendant was in custody and had not been advised of his Miranda warnings before he made the statements.  *See* Hinkle Disp. Mot. at ¶¶ 56–71. Mr. Hinkle's motion to suppress his statements to law enforcement, or, in the alternative, for a hearing, should be denied, because as discussed below, the defendant was not subjected to interrogation, and he submits no affidavit to the contrary.

### 1.    Relevant Background

The government attaches for this Court's review the Homeland Security Investigations (HSI) Report of Investigation (ROI) documenting the manner in which defendant Hinkle made statements to law enforcement.[41]  As described in the report, on October 24, 2023, Special Agent Halliday and Special Agent Zittle were responsible for transporting Mr. Hinkle from his residence to the Wellsville Police Department when Mr. Hinkle spontaneously uttered "*I know they interrogated one of my friends for hours . . . I thought they were going to come talk to me, but they never did . . . and now this bullshit.  I don't know what this has to do with me.  I didn't even know the guy.  I have only met him and the girl one time.*"  *See* Ex. M at 2.  The report from Special Agent Zittle specifies that "[a]ll utterances were made without provocation and have been incorporated herein in sum and substance."  *Id.*  The facts, as outlined in Special Agent Zittle's ROI, are uncontroverted.  Mr. Hinkle **does** **not** offer an affidavit contending that he was, in fact, questioned or otherwise provoked into making those statements.  In fact, Mr. Hinkle's affidavit makes no mention at all the statements he made to law enforcement or the

---

[41]    See Ex. M, ROI entitled "Spontaneous Utterances Made by Howard Hinkle JR on 10/24/2023", GOV-00027237.

circumstances surrounding those statements. Mr. Hinkle's attorney attempts to allege, on Mr. Hinkle's behalf, that the statements Mr. Hinkle made were compelled because "his free will was overborne." *See* Hinkle Disp. Mot. at ¶ 64. In support of this, Mr. Hinkle's attorney claims "Hinkle is a 48-year-old man with minimal education who was handcuffed in the back of a police car with no way out and surrounded by two police officers." Mr. Hinkle does not address, in his motion, the fact that he was asked no questions and in no way provoked to make the statements that he chose to make.

### 2.    Legal Framework

On a motion to suppress statements, the defendant bears the burden of showing that he was subjected to custodial interrogation. *See United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992) ("The defendant seeking suppression bears the burden upon [the] issue."). A motion for a suppression hearing should be denied where the defendant does not put a material issue of fact in dispute based upon personal knowledge. *See United States v. Gillette*, 383 F.2d 843, 848–49 (2d Cir. 1967) ("The affidavit submitted for appellant is insufficient in that it does not . . . allege personal knowledge on the part of appellant's attorney; accordingly, there was no factual issue to be resolved and the denial of a hearing was correct").

For the *Miranda* advice-of-rights requirements to be triggered, the defendant must be subjected to "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). The term "interrogation" includes express questioning of the suspect and its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Spontaneous utterances, or statements volunteered by a defendant are not custodial interrogation and are not, therefore subject to suppression under *Miranda*. *See United States v. Colon*, 835 F.2d 27,

28, 30 (2d Cir. 1987) (spontaneous or volunteered utterance by a suspect, even though in custody and having been subjected to prior questioning, was not the product of custodial interrogation, and thus not subject to suppression under Miranda).

A defendant challenging the voluntariness of a confession has the right to "a fair hearing and a reliable determination on the issue of voluntariness." *Jackson v. Denno*, 378 U.S. 368, 377 (1964). The issue is whether the conduct of law enforcement officials "was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *see also Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988) ("Is the confession the product of an essentially free and unconstrained choice by its maker?"). The voluntariness of a statement made by a defendant must be assessed based upon the totality of the circumstances. *See United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990). The prosecution bears the burden of showing voluntariness. *See Colorado v. Connelly*, 479 U.S. 157, 168–69. The inquiry centers around "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green* 850 F.2d at 900.

Historically, the principal cases in which coercion has been found have involved truly outrageous conduct by the police, such as beating the defendant, *see Brown v. Mississippi*, 297 U.S. 278 (1936); administration of a "truth serum," *see Townsend v. Sain*, 372 U.S. 293 (1963); depriving the defendant of food and holding him in a "sweat box," *see Brooks v. Florida*, 389 U.S. 413 (1967); threatening to take the defendant's ailing wife into custody, *see Rogers*, 365 U.S. at 534; or to deprive the defendant of her welfare benefits and custody of her children, *see Lynumn v. Illinois,* 372 U.S. 528 (1963). The Second Circuit has also found government conduct sufficiently coercive to render a confession involuntary in situations such as

continuing to question a suspect who was actively overdosing on drugs, *see United States v. Taylor*, 745 F.3d 15, 25 (2d Cir. 2014); where a suspect was told that if he asked for a lawyer he would be prohibited from cooperating with the government, *see United States v. Anderson*, 929 F.2d 96, 100–02 (2d. Cir. 1991); or where a prosecutor told a suspect, accurately though unrealistically, that he faced "a possible sentence of a hundred years," *see United States v. Duvall*, 537 F.2d 15, 25 (2d Cir. 1976).

### 3.    Application

Here, it is uncontested that Mr. Hinkle's statements, as memorialized in the HSI ROI, were spontaneous and volunteered, and as such, not subject to *Miranda*. As such, his motion to suppress those statements should be denied without a hearing. The defendant does not offer an affidavit, from someone with personal knowledge, putting any material issue of fact in dispute. To the extent that Mr. Hinkle moves to suppress statements made at the Wellsville Police Department, after he was Mirandized, the government does not intend to use any of those statements against Mr. Hinkle, except for purposes of cross-examination.

## II.    Conclusion

For the reasons stated above, the government respectfully requests that the Court deny the defendants' dispositive pre-trial motions (ECF Nos. 536, 540, 545, 548) to the extent the government has not consented to a hearing.

DATED:  Buffalo, New York, September 8, 2025.

MICHAEL DIGIACOMO
United States Attorney

BY:    s/NICHOLAS T. COOPER
s/CASEY L. CHALBECK
s/JOSEPH M. TRIPI
Assistant United States Attorney

138

United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202